Rocco Ungaro *et al. vs.* Rosario Mete.

AUGUST 6; 1942.

PRESENT: Flynn, C. J., Moss, Capotosto, Baker and Condon, JJ.

FLYNN, C. J. This is a bill in equity to enjoin the respondent from alleged continuing trespasses upon complainants' land and from interfering with their quiet and peaceful enjoyment thereof. After a hearing in the superior court upon bill, answer and evidence, a final decree was entered, granting the injunctive and other relief prayed for; and the cause is here upon the respondent's appeal from that decree.

The controversy centers upon the occupation by respondent of a triangular strip of land which was admittedly a part of the lots conveyed to complainants according to the description in their deeds and to the lines on the recorded plat. The answer and defense of the respondent, whose real name is admittedly Rosina Mete, were based on her claim of ownership of the title to this strip by virtue of continuous adverse possession thereof by her "for a period of more than twelve (12) years" and, together with that of her predecessors in title, for a longer period.

The evidence for complainants shows the following facts: Complainants owned lots numbered 35 and 36 on "Sam'l Hedly's Plat of a portion of the Olney Bradley Veazie land and Wilber Lot at North Eagle Park & Wanskuck N. Prov. belonging to Samuel Hedly Platted from surveys and other Plats by C. E. Paine June 1869." Together these lots form one tract bounding easterly on Veazie street 40 feet and holding that width extends westerly 160 feet to Sunnyside street, which is now Sunbury street. The respondent also owns two lots, numbered 37 and 38 on that plat, and together they extend from Veazie street on the east to Sunbury street on the west, and adjoin complainants' land on the south.

Each party took title by deed describing the lots, not by metes and bounds, but by reference to the lot numbers and the above-mentioned plat, which was duly recorded.

When complainant Rocco Ungaro acquired lot 36 on October 5, 1920, it was undeveloped and wooded land frequently used as a "dump"; and Sunbury street was not an improved highway. At that time respondent's lots were owned by Domenico Rocchio, now deceased. There was no continuous fence between their lots but only "a little fence" and some stones. Neither he nor complainants then knew the precise location of the division line between their lots. There was no disputed line nor attempt then to establish the true one. In 1925 or 1926 they agreed that, to keep dogs and children away from the plants, they would build a fence "temporarily" and sometime, when Sunbury street and the lines were established, they would build a "permanent fence" upon the division line according to the survey. Complainants and Rocchio then built a "chicken wire" fence and occupied their respective lots in accordance with that agreement. The fence was "crooked", "not straight" and was described as "weaving" from one side to the other. Repairs thereto were frequently necessary because of its very light construction. It was partly down on many occasions and was completely knocked down by the hurricane in 1938.

Occupation under this agreement continued until Rocchio, by deed dated April 12, 1929, conveyed lots 37 and 38 to this respondent by reference to the plat and without any reference to this fence. She took possession and for several years occupied the land up to the fence without incident. When Sunbury street was established, curbed and sewered, the parties paid assessments therefor in accordance with the lot lines as shown in the deeds and on the recorded plat. Apparently in 1935 or 1936, complainants were informed definitely that the chicken wire fence was not located upon the true line. This information came from one Olivo who had owned the land on the other, that is, the south, side of the respondent's lot and who had obtained a survey of his

land. Complainants and Olivo then notified respondent of this fact and she agreed with complainants to join in building a permanent fence on the true line.

The respondent did not then claim the title to this strip or the right to occupy it for any reason. Following some delay in carrying out the agreement, an engineer for complainants in June 1940 surveyed and staked out the true division line. The respondent was notified thereof and was asked to carry out her part of the previous agreement. She again promised to do this but, after further delay on her part, the complainants had their attorney write her on June 19, 1940, calling attention to the correct location of the division line, as shown by the survey and stakes then on the land, and asking for her immediate cooperation in fixing the true line.

The respondent and her husband acknowledged that they received and understood the letter and, according to complainants' son, again agreed that the land belonged to the complainants and that they would share the expense of a fence to be built upon the true line. Respondent's daughter, at her father's instruction, also wrote to complainants' lawyer in answer to his letter and assured him they would cooperate "in erecting the fence where the stakes were placed according to the recent survey which took place". She signed her father's name thereto at his direction. Complainants' son later knocked down the remaining portion of the chicken wire fence, obtained estimates for building a permanent fence, and planned to erect one on the true division line in accordance with respondent's agreement and direction. The respondent, between the time when the fence was knocked down and the new one was to be started, changed her mind and sought to prevent the building of a permanent fence on the true line. The present proceedings were then commenced.

On the other hand, the evidence for the respondent admitted that her deed called for, and that she expected to obtain, a lot measuring only 40 feet on Sunbury street,

whereas she now has more; that her grantor never represented that the fence was the true boundary line or that it had been so recognized and acquiesced in; that she had discussed with complainants over a considerable period of time the desirability of correcting the occupation line; and that she had agreed to share in the cost of erecting a permanent fence on the true division line. But she testified that this agreement was made subject to her receiving back from one Femino, her neighbor on the south, a small strip of her land upon which he evidently had been encroaching from 1935 or 1936. She admitted having received and understood the letter from complainants' lawyer and having talked thereafter with Femino to obtain a relinquishment by him of her land and that he had agreed to give her back that strip; but she denied that she had authorized or knew that her husband or daughter had written the letter to complainants' lawyer in which it was agreed that a new fence be built on the division line as staked out by complainants' engineer. She testified that she learned of it a few days after it had been mailed.

She testified, however, that she was then willing to give up her occupation of the strip in question provided Femino relinquished his occupation of her land and that she is still willing; but she did not testifiy, nor did her husband, that their daughter was ever directed to include such a condition in the letter actually sent to the complainants' lawyer. Respondent testified that Femino, after his agreement with her, had changed his mind and intended to claim a right to occupy the other strip; and she admitted that she had taken no proceedings to prevent his further occupation of her land.

She further testified that a chicken wire fence was there when she purchased her lot from Rocchio and, though repaired from time to time, it always was replaced substantially on the same line; that she had occupied and planted up to the fence on her side; and that she thought it was the line designated in her deed. She did not testify that Rocchio or these complainants had ever represented to her that the land conveyed to her went to the chicken wire fence, or that

this fence had ever been agreed upon to settle a dispute or to mark the boundary line. She denied that she had been informed by complainants or the witness Olivo, about the time when he had his land surveyed in 1935 or 1936, that this fence was then known to be on the wrong line, and she denied that she had then agreed with complainants to straighten out the line or build a permanent fence, although she did not deny that discussions concerning that matter had been going on for several years.

The trial justice found, in substance, that the respondent's answer and defense were based upon her claim to the title of this strip by virtue of adverse possession under G. L. 1938, chap. 438, § 2; that she therefore had the burden of satisfying all the statutory requirements thereof; and that she had failed to sustain that burden, particularly in relation to her claim that her occupation was adverse. He further found that Rocchio's occupation of the strip in question up to 1929 was not adverse; that, without tacking that period to respondent's occupation, she had not shown continuous adverse possession for more than the statutory period; and that upon the evidence as presented before him there was no recognition of and acquiescence in this chicken wire fence as a true boundary line for more than ten years, so as to come within the rule stated in *Doyle* v. *Ralph*, 49 R. I. 155.

The respondent's reasons of appeal reduce themselves, substantially, to the contention that the trial justice misconceived the evidence and the law. She argues that he was not justified in believing complainant Rocco Ungaro's testimony, and finding, as he expressly stated, that this complainant "seemed to be a truthful, candid witness, taking into consideration his limited knowledge of the English language." In support of this contention she argues in her brief: (1) That the complainant Rocco Ungaro "repeatedly contradicted himself"; (2) that he testified he did not know how the old fence was knocked down, whereas his son later testified that it was knocked down in the presence of his

father and mother; and (3) that Rocco testified at one point "that he informed respondent that the fence was not on the correct line some three or four years ago (1937 or 1938) and on cross-examination admitted that it was in 1940."

As to the first of the above reasons for her general assertions, she has cited no example of the alleged repeated self-contradictions in Rocco's testimony, and we have found none. Secondly, even if the son testified clearly that his father was present when the fence was knocked down, it does not follow that the father's testimony to the contrary was thereby rendered incredible. The son might have been mistaken, especially when, as here, none of the other witnesses, including the respondent and members of her family, testified that Rocco Ungaro was present when the old fence was actually knocked down.

As a matter of fact, even this supposed contradiction may be more apparent than real. If the rather confusing cross-examination of the son is read as a whole and compared with that of respondent's husband, it appears that there were two different incidents, one when the son knocked down the fence and another when he prepared to build the new one; and that his answer referred to the latter incident, whereas the respondent seeks to address it to the former. At any rate, this testimony by the son was not upon a vital point and was opposed to the testimony of all the other witnesses. In these circumstances the trial justice was not required to disbelieve that complainant.

Thirdly, Rocco Ungaro's testimony that the respondent was informed about "three or four years ago" that the fence was not on the correct line is supported to an extent by other testimony by his son and by the witness Olivo, and it is not denied that the respondent was notified in 1940 when the complainants' survey was made. Here again there were two different occasions referred to and if viewed from that complainant's position the testimony is not self-contradictory. Upon an examination of all the evidence, we cannot say that the trial justice misconceived or overlooked any material

evidence or that he was required to disbelieve Rocco Ungaro's testimony.

The respondent, notwithstanding her claim of adverse possession as relied upon in her answer, apparently argued also that the chicken wire fence was recognized and acquiesced in as the true boundary line between the lots for more than ten years, and that therefore this cause should be governed by the law which was stated and applied in *Doyle* v. *Ralph, supra.* On this point she also has cited to us the following cases: *O'Donnell* v. *Penney,* 17 R. I. 164; *Faulkner* v. *Rocket,* 33 R. I. 152; *Aldrich* v. *Brownell,* 45 R. I. 142; *Di Santo* v. *De Bellis,* 55 R. I. 433.

One answer to this contention, in our opinion, is that in all of those cases the question whether a given fence had been recognized and acquiesced in as a true boundary line for the prescribed period was plainly treated by the court as an issue of fact, to be determined upon the evidence as it was submitted to the court or jury as the case might be; and in all of them the evidence was entirely uncontradicted or substantially required a finding that the fence had stood for much longer than the prescribed period without any of the owners or their predecessors in title having disputed or objected to it in any way as an encroachment. Having once determined upon such evidence that the parties in those cases had recognized and acquiesced in a fence as the true boundary line for the prescribed period, the court properly held that they were thereupon to be concluded. In the instant cause, however, there is a finding by the trial justice, upon the evidence as presented to him, to the effect that there was no agreement for, or recognition of and acquiescence in, this fence as the true boundary line for more than ten years; and the evidence on this issue was not undisputed but was conflicting, and it did not require a finding that the fence had stood for the prescribed period without objection to it as an encroachment.

Unless the respondent here adds to the period of her own occupation of the strip in question that of Rocchio, her

predecessor in title, the evidence clearly fails to establish ten years of undisputed recognition of and acquiescence in this fence as the true boundary line, which would be necessary to bring it within the law of the above-cited cases. If the testimony of complainant Rocco Ungaro is believed, and the trial justice passed expressly and favorably upon his credibility, there is no evidence here of any agreement for, establishment of, or acquiescence in, this fence as the true boundary line by complainants and Rocchio. On the contrary, there is credible evidence of an express agreement between them that this fence was *not* to be used as the true boundary but only as a temporary fence to serve certain other purposes then expressed; and that a permanent fence would be erected by them later upon the true division line to be shown by a survey, when the lines of Sunbury street were located and established.

This evidence came from one of the owners who originally built the fence and he is still in possession of the same lot. Considering the nature of the land at the time and the character of the fence, this evidence is not inherently improbable. No such agreement or evidence is found in any of the cited cases; and the court in some of them expressly noted the total absence of evidence concerning the origin and circumstances surrounding the building of the fence. See *O'Donnell* v. *Penny, supra*. Upon such a view of the evidence, we cannot say that the trial justice was clearly in error in finding substantially that Rocchio's occupation under that agreement was never adverse to the complainants and that neither Rocchio nor complainants, up to 1929, had intended, or recognized and acquiesced in, this fence as the true boundary line.

Moreover, even if the period of occupation by Rocchio be added to that of the respondent, the evidence is conflicting and is open to different conclusions upon the question whether the fence had been recognized and acquiesced in as a true boundary for more than ten years. On the view thereof most favorable to complainants, the fence was

erected about fifteen years before trial, which would be approximately December 1926; and the complainants' objections to the encroachment by respondent, and the latter's expressed intention and agreement to correct the line and to join in building a permanent fence on the true line, began sometime around 1935, about the time when Olivo's land on the south side of respondent's lot came into Femino's possession. If this view of the evidence be taken, it would show that the fence had not stood without objection or dispute for ten years and that the parties had not recognized and acquiesced in it as the true boundary line for the required period. On the other hand, if the view of the evidence most favorable to the respondent be taken, it would show that the fence had been in existence substantially on that line for more than twelve years, as respondent contended.

In the circumstances, we cannot say that the trial justice was required, upon this conflicting evidence, to find that there had been mutual recognition of and acquiescence in this fence as a true boundary line for more than ten years, or that he was clearly wrong in finding that there had not been such recognition and acquiescence. In our opinion, therefore, the instant cause is clearly and extremely different from any of the above-cited cases or any pertinent Rhode Island case which we have found; and on its facts and the findings of the trial justice, it does not come within the rule therein applied.

The respondent's appeal is denied and dismissed, the decree appealed from is affirmed, and the cause is remanded to the superior court for further proceedings.

CONDON, J., dissenting. There is a great deal of evidence in the record that is of no consequence in determining whether the fence which constituted the visible boundary line between the lands of these parties became, by reason of the lapse of ten years or more, the true boundary line. On the undisputed evidence as to the original location of this fence and the length of time it was maintained by the parties as thus located, the vital question on appeal here, it

seems to me, is purely one of law. What may have been the understanding between complainant Rocco Ungaro and respondent's immediate predecessor in title at the time they built the fence is of no importance if, in fact, the fence remained undisturbed in its original location and was acquiesced in for a period of ten years or more as the occupation line between the lands of the parties.

Complainants do not deny the fact that the fence was located for such period and was respected, by themselves and the respondent and her predecessor in title, as the division line between their lots until it was torn down by complainants' son Daniel Ungaro sometime in May 1941. However, complainants seek to avoid the legal effect of such fact by offering the testimony of complainant Rocco Ungaro that he had an oral understanding with respondent's immediate predecessor in title, at the time the fence was first erected, that it was to be a temporary division fence until they could determine the true division line. Because I am of the opinion that complainants cannot, under our law, set up such an oral agreement to defeat the legal effect of a division fence which has stood undisturbed for ten years, I am constrained to dissent from the opinion of the majority.

The law is well settled in this state that acquiescence in a boundary line, assumed or established for a period equal to that prescribed in the statute of limitations to bar an entry, will preclude the parties from setting up the claim that the line so acquiesced in is not the true boundary. *O'Donnell* v. *Penney,* 17 R. I. 164. In its opinion in that case this court quoted with approval from *Baldwin* v. *Brown,* 16 N. Y. 359, 363, wherein it was said: "The acquiescence in such cases affords ground not merely for an inference of fact, to go to the jury as evidence of an original parol agreement, but for a direct legal inference as to the true boundary line. It is held to be proof of so conclusive a nature that the party is precluded from offering any evidence to the contrary."

The law as thus laid down over half a century ago has been followed without question. *Faulkner* v. *Rocket,* 33

R. I. 152; *Doyle* v. *Ralph*, 49 R. I. 155; *Di Maio* v. *Ranaldi*, 49 R. I. 204; *Di Santo* v. *De Bellis*, 55 R. I. 433; *Mari* v. *Lankowicz*, 61 R. I. 296. In the last-cited case the decision turned on a disputed question of fact as to whether a fence had actually stood on the line in question for the prescribed period of time. Had the complainant in that case established such fact, we recognized that he would have been entitled to prevail. We found, however, that he had failed to prove that fact and therefore the rule of the *O'Donnell* case did not apply.

In the instant case the existence of the fence on the occupation line for the required period is unquestioned. By their conduct the complainants have clearly acquiesced in this line as the true boundary line. Not only did they fail to do any act to disturb that line or question it, but they actively cooperated with respondent in maintaining it. Under such circumstances the rule enunciated in the *O'Donnell* case is peculiarly applicable. Having acquiesced in the location of the fence for so long a period, complainants ought not to be permitted to negative the effect of such conduct by testimony of an oral agreement with the immediate predecessor in title of the respondent. To permit such evidence to be considered would, it seems to me, defeat the rule of the *O'Donnell* case and greatly weaken its salutary influence "as a rule of repose" in quieting titles, where an actual boundary line has been so long established.

*Charles A. Kiernan*, for complainants.

*Waldman & Waldman, Joseph Veneziale*, for respondents.