342 A.2d 601.

Jacento Rosa *et ux. vs.* John Oliveira.

JULY 30, 1975.

Present: Roberts, C. J., Paolino, Joslin, Kelleher and Doris, JJ.

KELLEHER, J. This is a dispute between adjoining landowners about where their common boundary lies. The litigants live in Bristol on the east side of Wilson Street. The plaintiffs, Jacento and Maria Rosa, own a home located at 4 Wilson Street. The defendant John Oliveira and his wife Alice own and reside in a home bearing an address of 6 Wilson Street. The line in question runs easterly along the northern boundary of the Rosa property and along the Oliveiras' southern boundary. The Rosas sought injunctive relief in the Superior Court including a determination as to the location of the boundary line. Mr. Oliveira[1] denied the allegations contained in the plaintiffs' complaint and filed a counter-claim in which he sought money damages for the loss of some lilac trees. A hearing was held by a Superior Court justice who found in the Rosas' favor. The defendant has appealed.

Before turning to the evidence as it relates to the boundary line, we would repeat the well-settled principle that acquiescence in a boundary line assumed or established for a period of time equal to that prescribed in the statute of limitations to bar a reentry is conclusive evidence of an agreement to establish such a line and the parties will be precluded from claiming that the line so

---

[1] The Rosas initially brought suit against a Margaret Kilduff and John Oliveira. At trial it was disclosed that Margaret Kilduff is John Oliveira's mother. John and his wife had deeded the property to Mrs. Kilduff. This deed is on record. The mother then reconveyed the property to the Oliveiras. This deed is not on record. The trial justice, upon learning of this, directed that an order be entered eliminating the mother as a party defendant. Such an order was entered. As far as we can determine, Mrs. Oliveira has never been a party to this action. This omission can be rectified on remand by use of Super. R. Civ. P. 21.

acquiesced in is not the true boundary. *Essex* v. *Lukas,* 90 R. I. 457, 159 A.2d 612 (1960); *Malone* v. *O'Connell,* 86 R. I. 167, 133 A.2d 756 (1957); *Ungaro* v. *Mete,* 68 R. I. 419, 27 A.2d 826 (1942); *Mari* v. *Lankowicz,* 61 R. I. 296, 200 A. 953 (1938); *Di Santo* v. *De Bellis,* 55 R. I. 433, 182 A. 488 (1935); *Di Maio* v. *Ranaldi,* 49 R. I. 204, 142 A. 145 (1928); *Doyle* v. *Ralph,* 49 R. I. 155, 141 A. 180 (1928); *O'Donnell* v. *Penney,* 17 R. I. 164, 20 A. 305 (1890). It is equally well settled that although the issue of what constitute the boundaries of a parcel of land is a question of law, the determination of where such boundaries are is a question of fact. *Waldman* v. *Town of Barrington,* 102 R. I. 14, 227 A.2d 592 (1967); *Goloskie* v. *Recorvitz,* 101 R. I. 4, 219 A.2d 759 (1966). On appeal the appellant bears the burden of persuading this court that the trial court in making its findings of fact overlooked or misconceived material evidence. *Nugent ex rel. St. Dunstan's Day School* v. *St. Dunstan's College of Sacred Music,* 113 R. I. 666, 324 A.2d 654 (1974).

The adjoining lots[2] in this controversy each measure approximately 43 feet in width and extend from the inner edge of the sidewalk in an easterly direction for a distance of about 71 feet. The Rosas purchased their lot on October 2, 1970. Their grantor was the widow of a Manuel Mazza. Manuel's mother, Mary, had purchased the property shortly after the turn of the century and various members of the Mazza family had lived at 4 Wilson Street continuously up until the time of the 1970 sale. Anna Mazza Leandro appeared as a witness for the Rosas. She informed the trial justice that she remembered her mother's purchase of the property in 1904 or 1905 and the fence which ran between 4 and 6 Wilson Street. The fence, she

---

[2]Oliveira's parcel consists of two lots each of which has an approximate width of 43 feet and a depth of some 71 feet. Our sole concern is with the lot that abuts the Rosa' lot.

said, was made up of "wire and some boards." The wire portion began at the inner edge of the Wilson Street sidewalk and proceeded directly to a point just beyond a rear door to the Mazza homestead. From there the fence was made up of wooden boards or pickets, a top and a bottom stringer, and a series of posts. The posts faced the Oliveiras, and the pickets faced the Rosas. The wooden portion of the fence ran from the rear door to a railroad tie which served as an anchor or support of the eastern end of the fence. Immediately adjacent to the railroad tie is a post which is part of another fence which runs along the east edge of the Oliveira property.

Anna reported that her family made full use of all the property up to the wire and board fence as if it were their own and that at no time was there any challenge to their use of the land which ran along the fence. This witness lived at 4 Wilson Street until 1930 and continued to make regular visits there up until the time the Rosas acquired the property. Some time in the midfifties, another of Anna's brothers, Seraphine, built a small addition onto the north side of the house. Mrs. Rosa said this addition was about a "foot and a half" away from the fence.

The Oliveiras purchased their property from a Joseph L. Perry, Jr. on August 19, 1955. Mr. Perry had acquired the 6 Wilson Street property on April 22, 1933 by a deed of a Joseph Perry. It is conceded that in and about the wire fence there grows a line of lilac trees that were planted many many years ago. Some of the trees have grown to a height of 15 feet. Many of their branches or stalks measure anywhere between 2½ and 5 inches in circumference. As will be seen, the lilac trees are at the root of the conflict in which the litigants are immersed.

Apparently, sometime in the fall of 1970 the Rosas asked for and received permission of the Oliveiras to cut the

lilac branches which were resting on the roof of the addition built by Seraphine Massa. On Armistice Day, November 11, 1970, Mrs. Rosa took a saw and cut down those parts of the tree that were on the roof. Mr. Oliveira returned home during the afternoon of the holiday. He was disturbed by what he saw. According to Mr. Oliveira, the lilacs "had been cut bad [sic] beyond the boundary line," and when he asked Mr. Rosa about the pruning project, Rosa replied, "Oh, that. It bothered us. * * * You don't know what you own." While November 11, 1970 commemorated the cessation of World War I, it marked the beginning of hostilities which were to take place in the subsequent months on the "no man's land" that ran between the Oliveiras' and Rosas' residences.

Some time after the lilac episode when Mr. Rosa told Mr. Oliveira of his desire to replace the old fence with a new one that would afford greater protection to children, Oliveira repiled, "You can't put the fence because this fence is mine and you can't touch it." From that point on, everything, in a manner of speaking, went down, including the wooden part of the original fence. Mr. Oliveira replaced the wooden section with another wooden fence. It came down. In November 1971, the Rosas hired a fence builder who came out to the property, cut some lilacs, poured some cement and set up some steel poles. Mr. Oliveira ripped out the poles. As fences and poles came down, tempers on both sides of the line went up. Neighborliness had deteriorated to a point where the entire original fence had been removed. The Bristol police made several visits to both properties. Each side hired surveyors to lay out and determine the location of the dividing line between the two parcels of real estate. Finally, in January 1972, the Rosas filed their complaint.

Some of the testimony the trial justice heard was un-

contradicted, while other evidence presented to him was in conflict.

The extent of use to which the Mazza family put their property was uncontradicted. They considered all of the property running up to and alongside the wire-wooden fence as theirs. It is also uncontradicted that up until Armistice Day, 1970, the Oliveiras never uttered a word of protest as to the Mazzas' or the Rosas' use of the property along the fence. In fact, in his reply brief Mr. Oliveira states that this case did not arise out of a dispute regarding the boundary but it "started over the cutting of the lilacs."

There were some conflicts in testimony. Mr. Oliveira insisted that no one could pass between the addition to the Rosas' home and the fence. Mrs. Rosa returned as a rebuttal witness and denied that this was so. She also denied Mr. Oilveira's charge that she had cut down the lilac bushes that grew on his side of the line.

Another conflict was found in the testimony of the three witnesses who could be classified as experts. Each expert had made a survey of the land and a study of the necessary recorded documents, and gave his opinion as to where the boundary line should be set. Two of the experts were registered land surveyors. One was hired by the Rosas. The other was employed by Mr. Oliveira. The third expert was a civil engineer who testified in behalf of the Rosas.

The civil engineer testified that in July 1971, he went to the disputed area and made what he described as an occupational survey. At that time the wire-wooden fence was standing. He used the existing fence to measure the area then being used by the Rosas. He placed a pipe at its western beginning and another pipe at its eastern terminus. He had assumed that the adjoining landowners had agreed to the existing boundaries. When he notified the Rosas that they did not have the width called for in

their deed, he learned of the dispute. He then examined the relevant recorded deeds and plats. He returned to the eastern end of the fence and took the pipe and moved it 1½ feet to the south. A plan he prepared is an exhibit.[3] It shows a series of dotted lines which indicate the line upon which the fence stood for almost 70 years as well as a solid line which indicates the division or boundary line that resulted from his analysis of various recorded plats and deeds. The fence line and the division line run eastward together for a distance of 10 feet at which point the fence line veers off and runs in a somewhat northeasterly direction until it comes to the rear property line. The engineer's plan indicates that the distance between the eastern termini of the two lines is 1½ feet.

The surveyor who testified for the Rosas declared that when he made his survey in June 1972, the fence was not standing. He had made no effort to lay out the fence line. In essence, this expert testified that to make the boundaries conform to the correct lot sizes he would take the fence line found on the engineer's plan and keeping it at an angle of 90 degrees to Wilson Street, move it 6 inches to the south. The line he established would be about 5¼ inches away from the addition built by Seraphine Mazza. A plan prepared by this witness is an exhibit.

The Oliveiras' surveyor conceded that many of the measurements on the plan he prepared differed from those offered by the Rosas' surveyor. The Oliveiras' survey was made in February 1972 and of course at a time when the fence was not in place. Oliveiras' expert concluded his testimony by saying that the division line he laid out was "roughly * * * in agreement" with the plan prepared by the Rosas' engineer. The plan formulated by the Oliveiras' expert is also part of the record.

---

[3]See appendix.

It was agreed that the pipe which the engineer placed at the westerly beginning of the converged fence and division lines was accurate and correct. Any difference between the experts as to the location of the division line as shown by the deeds and plats is completely immaterial in the light of the trial justice's finding as to the fence line, since he found that the case presently under review falls squarely within the ambit of the rule first pronounced in *O'Donnell* v. *Penney, supra.*[4] He found that the fence, which was built long before Mrs. Rosa took her saw to the lilacs, served as the dividing line between the two properties. He ruled that the dotted line which is depicted on the engineer's survey plan was the boundary line to be established and we see no reason whatever to change that finding.

In his brief, Mr. Oliveira has argued that the trial justice erred in adopting the fence line depicted by the Rosas' engineer. He points to the preciseness of the dotted line as it appears on the engineer's survey and then alludes to a portion of Mrs. Rosa's testimony when she described the wooden fence as "leaning" towards the Oliveiras' property. Mr. Oliveira complains that the sketch does not show any "lean." However, the transcript indicates that once Mrs. Rosa acknowledged the "leaning," in almost the next breath, she denied that there was any give in the posts. When asked if the posts also leaned toward the Oliveira property, she replied, "No, they were strong,

---

[4]One of the rationales of the rule is that since acquiescence does not pass title to real estate but merely defines the line between the respective lands, there is no concern about the statute of frauds. The rule is one of repose in that it quiets title to real estate and prevents uncertainty, confusion, and litigation which can result from the disturbance of a long-established boundary line. *O'Donnell* v. *Penney,* 17 R. I. 164, 20 A. 305 (1890). The statutory period which precludes reentry is 10 years. It is found in our adverse possession statute. General Laws 1956 (1969 Reenactment) §34-7-1.

very strong." While there was some give in the board or picket portion of the fence, the wooden posts were solidly positioned in the ground. Although the leaning pickets might have constituted an intrusion of the air space over the Oliveira property, our concern in this proceeding is not with air rights but with the use to which the Rosas and their predecessors in title put the real estate that ran along the bottom of the side of the fence that faced them. It is obvious that the engineer, whose professional qualifications were conceded at trial, in establishing the line relied upon the vertical position of the posts and the pickets as they appeared at or near ground level, and we perceive no reason to fault his calculations.

Mr. Oliveira's counterclaim was based on his allegation that the Rosas had damaged his lilac trees. The trial justice in ruling for the Rosas commented on Oliveira's failure to pinpoint the location of the damage to each tree. Mrs. Rosa insisted that she cut only those branches that protruded over or through the wire fence. In taking such action, she was exercising her common-law right as a landowner to cut off the limbs which were overhanging or encroaching on her property from trees located on the adjoining property. *Robinson* v. *Clapp,* 65 Conn. 365, 32 A. 939 (1895); *Michalson* v. *Nutting,* 275 Mass. 232, 175 N.E. 490 (1931); *Cobb* v. *Western Union Telegraph Co.,* 90 Vt. 342, 98 A. 758 (1916); see Annots., 128 A.L.R. 1221 (1940), 76 A.L.R. 111 (1932), 18 A.L.R. 655 (1922). Even though there is evidence that the fence builder hired by the Rosas had cut some of the lilac trees, Mrs. Rosa testified that the fence was being built on their property 1 foot away from the original fence line. Having brought the counterclaim, Mr. Oliveira incurred the burden of persuading the trial justice that the Rosas or their agents had damaged that portion of the trees that was on his side of the line. This he failed to do. We see no miscon-

ception of evidence that would warrant a reversal on this facet of the litigation.

We come finally to Mr. Oliveira's complaints that he has been denied due process by the actions taken by the trial justice and the various attorneys who have represented him during the time this case was pending in the Superior Court.

He faults the trial justice because of a prejudice which he claims is manifest when one considers several comments made during the trial. The comments involved the trial justice's suggestion that if the parties could resolve their differences, the costs of trial and appeal could be avoided. While the trial justice did, at one point, allude to the actual amount of land involved in the dispute as being trivial, he emphasized that even if land could be considered trivial, a landowner had a right to have a trial as to where his land ended and his neighbor's began. The litigants had a full-blown trial. At the conclusion of the trial, the trial justice observed that while the evidence to which he had just listened might be considered as a "tempest in a teapot," such a phrase could not be applied to a dispute in which real estate is involved. When all the evidence was in, the trial justice correctly invoked the doctrine of continual acquiescence in an established boundary line, and as noted earlier, if Mr. Oliveira's counterclaim was to attain success, he was bound to show that the damage he described occurred on his side of the line. This he did not do.

Mr. Oliveira has lodged a number of complaints against several of the attorneys who represented him at one time or another while this case was pending in the Superior Court. At one point, the Rosas sought the appointment of a master. Mr. Oliveira telegraphed his objection to this procedure. Although an order was entered appointing the master, the telegram did its job. The master never func-

tioned. A pretrial order was entered by consent enjoining all parties from doing anything to disturb the status quo pending a hearing. Mr. Oliveira now says he did not authorize the entry of such an order. He also claims that he did not authorize a jury-waived hearing even though the record shows that no attempt was ever made to have a jury trial on either the Rosas' complaint or his counterclaim. He also faults his trial counsel for failing both to produce a police report relating to the Armistice Day disturbance and to subpoena two witnesses who allegedly would testify as to who built the fence, who planted the trees, when they were planted, and the distance between the Seraphine Mazza addition and the fence. He also complained that his trial counsel should not have attended several conferences held in the trial justice's chambers.

Most of Mr. Oliveira's complaints were made after the trial justice found against him.

We would only point out that an attorney of record is the person who is in charge of the client's business in any action, suit, or proceeding. The attorney is his client's agent and the client by employing an attorney authorizes the attorney to take such steps as the attorney deems legal, professional, and necessary, and the attorney's actions in the absence of fraud must be regarded as the acts of his client. *Home Ins. Co. v. Sormanti Realty Corp.*, 102 R. I. 187, 229 A.2d 296 (1967); *McLyman v. Miller*, 52 R. I. 374, 161 A. 111 (1932).

Before us, Mr. Oliveira has presented a surveyor's plan which was not introduced into evidence and affidavits of the two witnesses who were never subpoenaed. We cannot consider these documents. The record for review in this court must be made in the trial court.

It is unfortunate that in a law suit there must be a loser. However, that is the nature of an adversary proceeding such as the case presently before us. The defend-

ant's chagrin at the adverse result he obtained in the Superior Court is understandable. Nevertheless, he has demonstrated nothing in the conduct of the trial justice or the actions taken by his several counsel that justifies a reversal of the judgment entered in the Superior Court.

The defendant's appeal is denied and dismissed and the case is remanded to the Superior Court for further proceedings.

# APPENDIX *

\* THIS IS A COPY OF A PORTION OF THE SURVEY PLAN SUBMITTED BY THE ROSAS' ENGINEER. THE SOLID LINE INDICATES THE BOUNDARY LINE HE DETERMINED AFTER A STUDY OF VARIOUS PLATS AND DEEDS. THE DOTTED LINE REPRESENTS THE LINE OF THE FENCE AS OF JULY 16, 1971.

THE 128.2' FIGURE REPRESENTS THE COMBINED FRONTAGE OF THE OLIVEIRAS' TWO LOTS PLUS A THIRD LOT WHICH IS LOCATED AT THE CORNER OF WILSON AND ST. ELIZABETH STREETS.

*James D. Levitt,* for plaintiffs.

*John Oliveira,* defendant, pro se.