### R. I. TURNPIKE & BRIDGE AUTHORITY

v.

### Earle F. COHEN and One Bellevue Avenue, Inc., d/b/a The Viking.

No. 79–175–Appeal.

Supreme Court of Rhode Island.

July 30, 1981.

W. Ward Harvey, Newport, Edward T. Hogan, Providence, for plaintiff.

Z. Hershel Smith, Providence, for defendants.

## OPINION

BEVILACQUA, Chief Justice.

The defendants, Dr. Earle F. Cohen and One Bellevue Avenue, Inc., a Rhode Island corporation, doing business as a hotel and restaurant, appeal from a judgment of the Superior Court permanently enjoining them from advertising an offer of dinner at the hotel in exchange for Newport Bridge tokens and from acquiring these tokens from resellers for promotional purposes.[1]

The plaintiff, Rhode Island Turnpike and Bridge Authority (the Authority), is a corporate and politic body created by statute with controlling authority to operate and maintain the Mt. Hope and Newport Bridges. *See* G.L. 1956 (1979 Reenactment) §§ 24–12–2 and 24–12–9. Under §§ 24–12–

9(i), 24–12–26 and 24–12–27, plaintiff is required to fix and collect tolls and to set toll rates sufficient to pay the cost of upkeep on the bridge and the principal and interest on bonds issued to finance the building of the bridge.[2] *See* § 24–12–18. In a September 1965 report, plaintiff's traffic engineers, DeLeuw, Cather & Co. (DeLeuw, Cather), recommended a commuter fare of one-half the regular rate for users of the Newport Bridge. The plaintiff's directors eventually adopted this recommendation, which is reflected in the current charge of $1 per vehicle for commuters and $1 per axle for all other vehicles. Those using the bridge at the commuter rate are required to purchase tokens.

Prior to October 1973, tokens could be purchased in bulk by anyone. By resolution of plaintiff's directors, bulk sales were then prohibited except to small groups of fleet-vehicle users such as the United States Navy. This decision came about because local businesses were buying up large quantities of tokens for $1 apiece and selling them to their customers for a price of between $1.10 and $1.30 as a means of increasing business. From 1973 until the present, token purchases have been limited to ten for $10 at the bridge or twenty for $20 in plaintiff's office, with the exception of fleet users. Additionally, plaintiff has posted a sign at the toll booth indicating that the tokens are nontransferable.

On October 14, 1976, defendant Dr. Earle Cohen appeared at the office of plaintiff's principal director, James Canning, and attempted to buy 5,000 tokens. Canning refused to sell such a quantity to defendant. Apparently, defendant wished to give away

---

1. Throughout this opinion, we shall refer to Dr. Cohen as defendant and to the corporation as The Viking.

2. Although the Newport Bridge did not open until 1969, the matter of setting tolls for the bridge was considered at least as early as 1965. A separate provision in G.L. 1956 (1979 Reenactment) § 24–12–27 requires plaintiff to establish a commuter rate for users of the Mt. Hope Bridge; the section is silent with regard to a commuter rate for the Newport Bridge. Under § 24–12–25 plaintiff is given the authority to

secure the issuance of bonds through a trust agreement. By trust indenture dated December 1, 1965, plaintiff has entered into such an agreement with its bondholders and the Rhode Island Hospital Trust Bank as trustee. In art. V, § 501(1)(b), of this agreement, plaintiff covenants that it will set a toll schedule complying with recommendations of a report made by DeLeuw, Cather & Co., a group of traffic engineers retained by plaintiff. *See* § 24–12–9(m) (authority to employ consulting engineers when necessary).

tokens to patrons of The Viking living on the western side of the Newport Bridge to encourage them to make the trip to Newport. Because defendant could not buy enough tokens himself, he then needed to rely on other customers—those buying commuter tokens regularly—to supply him with tokens for distribution. Subsequently, The Viking began offering dinners to local residents for a certain number of tokens. To this end, defendant placed ads in two newspapers. As soon as the ads appeared, plaintiff commenced this action.

On October 28, 1976, the Newport County Superior Court issued a temporary restraining order enjoining defendant from promotional activities in connection with the tokens. Two years later, after a hearing on the merits, the court specifically found that plaintiff would suffer irreparable injury if defendant continued to acquire tokens for distribution, and the court entered a judgment permanently enjoining defendant from such activity.

The defendant raises several issues, but for purposes of this appeal, we need to consider only whether or not plaintiff carried its burden of demonstrating that defendant's activities would cause irreparable harm through lost revenue.

Because of the nature of the issue involved, it will be necessary to review, in detail, the testimony given by Mr. Canning, who was plaintiff's only witness.

Initially, Canning conceded that plaintiff operates the Newport Bridge at a deficit and relies on funds appropriated by the state to meet the balance of its financial obligations. Canning also testified that it was his belief that the commuter rate for the Newport Bridge was designed primarily for the benefit of Rhode Island passenger-car drivers who work in the Newport area. On cross-examination, Canning altered this statement, explaining that the commuter toll was established for Rhode Islanders (without qualification) and that his fear was that defendant's ads would attract out-of-state visitors by making tokens available to this group at a cheaper rate.

On direct examination, counsel for plaintiff introduced the minutes of plaintiff's October 1973 directors' meeting at which the directors decided to limit bulk sales drastically. Canning then testified about what motivated the Authority to restrict bulk sales. Essentially, Canning repeated the statement in the minutes of the meeting. According to the minutes, "it [bulk sales] was eroding potential two-dollar occasional users of the bridge." No survey reports or statistical data were offered to support this conclusion.[3]

On cross-examination, Canning characterized the reasons for plaintiff's decision not to sell in bulk as "apparent" because "undercutting" and "discounting" by a third party would, in the opinion of the Authority, automatically cut into summer tourist revenues derived from $2 charges. Later, Canning stated that the decision not to sell in bulk was made solely on the observations of the directors and "details they would ask of me."

With regard to the probable impact of defendant's particular scheme, Canning made three separate references to a report (or advice) given by DeLeuw, Cather after 1973, which report allegedly provided some basis for the action taken by plaintiff.[4] Canning's initial reference was to a report made after the decision not to sell in bulk. This post-1973 report allegedly dealt with revenue losses stemming from bulk sales. The plaintiff was advised as part of, or in connection with, this report that it was its "prerogative" to set and control tolls.

The second reference to a post-1973 DeLeuw, Cather report was made by Canning

---

3. The defendant's counsel made a motion to strike the statement made by Canning arguing that this was a conclusion made without a foundation. The trial justice overruled this objection stating that the conclusion was based on a discussion involving all five of plaintiff's directors.

4. None of these post-1973 references to reports should be confused with the 1965 DeLeuw, Cather report, which was admitted as an exhibit.

in response to the question of whether or not a study was made of the effect of bulk sales on revenues. Initially, Canning stated that he interviewed the toll takers himself and did his own study. He was unable to say what the results of the study revealed, and he had no data on the study. Canning then made reference to a DeLeuw, Cather report made sometime in 1975 or 1976 in which the engineers advised plaintiff to "tighten up." This report may or may not have been the report alluded to earlier by Canning.

The third reference to a post-1973 report by DeLeuw, Cather came when plaintiff's counsel questioned Canning regarding the existence of a study on the stimulation of traffic over the bridge attributable to the increased availability of tokens produced by schemes like defendant's. Canning began by stating that no study had been made. Next he stated that the engineers had advised plaintiff that the increased availability of tokens would not compensate for the loss of the $2 tolls and that the manner in which tokens were sold at present was the most desirable for maximum revenues. Counsel then handed Canning a copy of an actual DeLeuw, Cather reported dated December 7, 1976, that allegedly supported the engineers' conclusions concerning this problem. This December 1976 report was not introduced into evidence, but defendant's counsel did not object to a brief summary given by Canning regarding its contents. Nonetheless, Canning's summary constituted a repetition of plaintiff's position that the "induced traffic" would not make up for the loss of revenue from $2 users. Once he was handed the report, Canning conceded that he requested the December 1976 report after initiation of this law suit and that it did not deal with differences in the amount of use of the bridge between the peak-use periods (summer) and the off-peak periods.

■ We note that, before issuing an injunction, a court must survey the facts and apply the traditional tests for equitable relief. This involves balancing the equities, weighing the hardships to either side, and examining the practicality of imposing the desired relief. In addition, the complaining party must show that any legal remedy would be inadequate. See Stone v. Peckham, 12 R.I. 27, 30–31 (1878). In the context of an injunction, this latter requirement is often labeled irreparable injury. D. Dobbs, Remedies § 2.10 at 108 (1976); see Lewis v. S. S. Baune, 534 F.2d 1115, 1124 (5th Cir. 1976); cf. School Committee of Pawtucket v. Pawtucket Teachers' Alliance, Local No. 930, 117 R.I. 203, 206, 365 A.2d 499, 501 (1976) (burden of proof falls on moving party to show irreparable harm for preliminary injunction). Irreparable injury must be either "presently threatened" or "imminent"; injuries that are prospective only and might never occur cannot form the basis of a permanent injunction. Ashland Oil, Inc. v. F.T.C., 409 F.Supp. 297, 309 (D.D.C.1976), aff'd, 548 F.2d 977 (D.C.Cir. 1977).

■ A plaintiff may prove irreparable harm or the inadequacy of a legal remedy in several ways.[5] One of the most common illustrations is that of a continuing trespass interfering with an interest in property. See, e. g., Newport Yacht Club, Inc. v. Deomatares, 93 R.I. 60, 64, 171 A.2d 78, 80 (1961); Raposa v. Guay, 84 R.I. 436, 444, 125 A.2d 113, 117 (1956). Inadequacy of the legal remedy may also be shown when a party is entitled to damages but the court is not capable of measuring those damages. See Dobbs, supra, § 2.5 at 58.

■ Ultimately, the existence of irreparable harm is a factual determination

---

5. In limited instances, courts have recognized that, by statute, the Legislature may abrogate the irreparable-harm requirement. See, e. g., Fleming v. Salem Box Co., 38 F.Supp. 997, 998–99 (D.Or.1940); Arizona State Board of Dental Examiners v. Hyder, 114 Ariz. 544, 546, 562 P.2d 717, 719 (1977); Paul v. Wadler, 209 Cal.App.2d 615, 625, 26 Cal.Rptr. 341, 347 (1962); Ackerman v. Tri-City Geriatric & Health Care, Inc., 55 Ohio 2d 51, 56–57, 378 N.E.2d 145, 148–49 (1978). The plaintiff does not contend that he is relieved of proving irreparable harm, and we find no provision in title 24, chapter 12 of the General Laws which would eliminate this requirement under these circumstances.

made at the conclusion of all the evidence. *School Committee of Pawtucket v. Pawtucket Teachers' Alliance, Local No. 930,* 117 R.I. at 208, 365 A.2d at 502. In the present case, the trial justice made factual findings that defendant's practice would reduce revenues, interfere with plaintiff's rate structure, and adversely affect its statutory and contractual obligations. This court will overturn a trial justice's findings of fact only when such findings are clearly wrong or when the trial justice overlooked or misconceived material evidence. *E. g., Lisi v. Marra,* R.I., 424 A.2d 1052, 1055 (1981); *Santilli v. Morelli,* 102 R.I. 333, 336–37, 230 A.2d 860, 862 (1967). We will be persuaded that a trial justice is clearly wrong if he has made findings of fact that were not based on sufficient or competent evidence. Therefore, in the case at bar, the question may be narrowed to whether the evidence supports the trial justice's findings of irreparable injury. The plaintiff's sole basis for claiming injury or damages lies in its contention that defendant's activities would result in a loss of revenue.[6]

In the case of a suit to enjoin a landowner from excavating his land, this court held that equity will not enjoin the property owner "unless some serious injury is imminent." *McMaugh v. Burke,* 12 R.I. 499, 499 (1880). The *McMaugh* plaintiff's complaint failed to show facts sufficient to invoke equitable protection. *Id.* In *Otto Seidner, Inc. v. Ralston Purina Co.,* 67 R.I. 436, 24 A.2d 902 (1942), the plaintiff claimed defendant's erection of a coal yard would result in a nuisance. The *Seidner* court posited that under these circumstances plaintiff had the burden of showing by clear and convincing evidence that substantial damage to its property would follow. *Id.* at 451, 24 A.2d at 909. The court found that the evidence offered on the issue of anticipated nuisance was almost entirely opinion evidence and that such evidence did not rise to the level of clear and convincing evidence. *Id.* at 451–52, 24 A.2d at 909–10.

■ The evidence offered by plaintiff in this case is largely opinion, although Canning claimed to have other information that supported plaintiff's position. This evidence was apparently contained in the December 1976 report by the traffic engineers. In this report the engineers allegedly concluded that plaintiff should maintain tight control over who received tokens and that the "induced traffic" would not equal or exceed lost revenues. Because the report was not introduced into evidence, however, it cannot be taken into account on this appeal. *See Rosa v. Oliveira,* 115 R.I. 277, 287, 342 A.2d 601, 606 (1975); *Murray v. Gervais,* 112 R.I. 768, 770 n.1, 315 A.2d 750, 751 n. 1 (1974); *Cahill v. Slaimen,* 56 R.I. 265, 270, 185 A. 257, 259 (1936). This court, nevertheless, may at least consider the testimony regarding this report, despite its hearsay character, and accord it "such probative effect as under all the circumstances is deemed proper." *Gilbert v. Girard,* 109 R.I. 68, 71, 279 A.2d 919, 922 (1971); *see Quinn v. Drummond,* 47 R.I. 215, 217, 132 A. 439, 440 (1926).[7] Unfortunately for plaintiff, Canning's testimony concerning this report amounted to an opinion lacking any foundation reviewable by this court.

■ As noted previously, equitable relief may be appropriate when damages prove difficult to measure or when a defendant continually interferes with a plaintiff's interest in property. The plaintiff, however,

---

6. We must assume that the loss of revenue would account for any interference with plaintiff's rate structure or any adverse effect to plaintiff's statutory or contractual obligations which were found by the trial justice. In its pleadings, plaintiff averred that defendant's action gave "the impression to users of the Newport Bridge that there is collaboration between the management of the Viking Hotel and the Plaintiff in promoting the private business enterprises of [defendant]." In addition, plaintiff contended that the tokens could be used only as payment for travel across the bridge. At trial, however, plaintiff did not develop any separate theory of injury or damage that would follow from these allegations apart from its belief that defendant's activities would drain revenues.

7. This result follows because defendant's counsel made no objection to Canning's brief references to the conclusions contained in this report.

**184**

must demonstrate that defendant's activities will cause some damage or interference. *See Otto Seidner, Inc. v. Ralston Purina Co.*, 67 R.I. at 451, 24 A.2d at 909.

■ At trial, plaintiff structured its case on the premise that the existence of lost revenue was "apparent." No reports, statistical evidence, or other data were offered in evidence to support a finding of irreparable harm.[8] *Cf. Bitterman v. Louisville & Nashville R. R. Co.*, 207 U.S. 205, 225, 28 S.Ct. 91, 98, 52 L.Ed. 171, 183 (1907) (testimony demonstrated actual monetary loss from practice of dealers purchasing and selling nontransferable tickets). Surmise alone cannot afford the basis for injunctive relief. *Camp v. Shannon*, 162 Tex. 515, 519, 348 S.W.2d 517, 519 (1961). Accordingly, we hold that plaintiff did not sustain its burden of proof.

Having found no evidence of irreparable harm on this record, we wish to stress that our decision is a limited one. First, nothing in this opinion should be construed as barring plaintiff from a new application for relief. Changed circumstances might provide plaintiff with an adequate basis to renew its attempt to secure a permanent injunction. Moreover, if a new hearing was granted, plaintiff may wish either to introduce evidence that would support its claim of lost revenue or to develop other theories of damage or injury consistent with its pleadings.

Second, our holding in this appeal does not affect plaintiff's authority to continue to set and collect tolls. For example, plaintiff's policy to restrict bulk sales remains unchanged by today's decision. Additionally, plaintiff may effectuate any changes in policy which reflect an adherence to its statutory mandate to set and collect tolls.

Finally, our determination does not preclude action by the Legislature. Legislation making the unauthorized transfer of tokens a civil or criminal offense could be proposed. The enabling act could be amended to include a provision granting the plaintiff the power to petition for injunctive relief to enjoin interferences with its statutory duties. Such a statute could be intended to abrogate the requirement of irreparable harm. We offer these remarks only to emphasize the narrow scope of this opinion and of our holding that rests on a failure of proof at trial.

The defendant's appeal is sustained, the judgment appealed from is vacated, and the case is remanded to the Superior Court.

MURRAY and SHEA, JJ., did not participate.

---

8. The record also reveals that counsel for plaintiff conceded the basic thrust of defendant's argument concerning the issue of irreparable harm when he made the following statement: "I will stipulate, if it will help at all, that the gift of a token to someone who would not ordinarily use the bridge and would not pay a two-dollar toll would not erode revenues, insofar as it's not depriving us of the normal two-dollar toll."