[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
DECISION
Plaintiffs in the above-entitled actions are unions whose members are employees of the State of Rhode Island. Their several complaints, which by agreement have been consolidated for purposes of these proceedings, are directed to Executive Order No. 91-11, issued by the Governor of this State on February 7, 1991.[1]
In the first instance, the unions challenge the Governor's constitutional and legislative authority to promulgate the Order, and particularly its directive to cause shutdowns for ten days between now and the end of the current fiscal year, June 30, 1991.
Secondly, the plaintiffs contend that even if the Order is not constitutionally or legislatively infirm, they are nonetheless entitled to injunctive relief from the planned shutdowns.
The Constitutional Issue
It is not disputed that the State is presently confronted with a budget deficit of massive proportions. Nor is it questioned that the State is grappling with a near paralyzing cash flow crisis which, if not immediately alleviated, will have devastating consequences, including the State's inability to meet its payroll obligations.
In an effort to cure these fiscal ills, as well as to adhere to a mandate to balance this State's budget, the Governor issued the Executive Order which is the subject of the complaints herein. At issue is the Governor's constitutional and legislative authority upon which to base his directive that employees answerable to the Executive Branch of State government be subjected to intermittent shutdowns for ten business days without pay.
The ten designated shutdown days are not compressed in consecutive fashion. Rather, it is contemplated that the shutdowns will fall intermittently within the span of the remainder of this fiscal year (March, 4 days; April, 3 days; May, 2 days; June, 1 day). The targeted days will or have been posted so that the affected employees will have advance notice of the cessations and can plan accordingly.
A hearing on the plaintiffs' challenges to the shutdown program was held before this Court on March 6. The Court has been directed to various constitutional and statutory citations, as well as to numerous judicial decisions, briefs, affidavits, and other exhibits to the pleadings, all of which are a matter of record and need not be further recited here.
At the outset, the unions contend that the Governor's power is restricted and limited, and that it is subservient to a much stronger Legislative Branch. Counsel for the State disputes this contention, arguing that the Legislative, Executive, and Judicial arms of the State are co-equal branches of government.
This Court finds it neither necessary nor productive to engage in a protracted discussion to determine which of these triumvirs, if any, is mightier than the next. The only question which the Court must presently decide is whether the Governor has, at least, the authority to implement the planned shutdowns which are contemplated in Executive Order 91-11. The Court is satisfied that he does.
The Constitution mandates that the Governor be vested with chief executive power within the State, and that he must ensure that the State's laws be faithfully executed. R.I. Const., Art. 9, §§ 1, 2. The legislature has also provided the Governor with the power, through his appointed Director of Administration, to prepare and administer the State's budget. § 42-11-2(a)(b), RIGL.
Further, pursuant to § 35-3-16, RIGL, the legislature has authorized the Governor to reduce or suspend appropriations for all Executive departments in order that a balanced budget be maintained.
Upon those authorities, and upon a review of the affidavits of Messrs. Baird and Sasse, and the exhibits thereto, the Court is persuaded that there has been delegated to the Governor, both expressly and impliedly, the authority and discretion to effectuate personnel cost reductions throughout the Executive Branch of State government, including the contemplated shutdowns.
The implementation of those personnel cost reductions,i.e., what the State has referred to as the "hard choices" necessary and attendant to such reductions, devolved to the Governor. Plainly, the legislature did not pass but the hilt of the sword to the Governor and, at the same moment, retain its blade. To the contrary, the legislature assigned and conveyed the saber and its cutting edge to the Governor with the authority to use it suitably in order to cut the State's deficit and to bring the State's budget to level balance.
It does not appear to the Court that the Governor has wielded the sword unsuitably or in arbitrary and capricious fashion. The contemplated shutdowns are scheduled at periodic intervals in an effort to exact the least impact on the affected employees. Nor do these temporary work cessations follow in consecutive order so as to occlude a department's operations for any extended period of time.
Charged, as he is by the Constitution, to ensure that the laws of this State are faithfully carried out, and having a mandate to administer as well as to balance the budget, and being armed with recent legislation enabling him to effectuate personnel cost reductions to defray the deficit and cure a cash flow crisis, it follows that the shutdowns are a logical, rational, and constitutionally permissible step by the Chief Executive in accordance with a valid and legitimate interest of the State.
The Injunction Issue
An injunction is "an extraordinary remedy." Brown v.Amaral, 460 A.2d 7, 10 (R.I. 1983). Before a trial court will exercise its discretion to issue an injunction, the moving party must affirmatively demonstrate that it will probably succeed on the merits of its claim and that it will suffer immediate irreparable harm absent injunctive relief. Further, the movant must persuade the court that it has no adequate remedy at law. Importantly, the court must balance the equities between the parties: the relief which is sought must be weighed against the harm which would be visited upon the other party if an injunction were to be granted. R.I. Turnpike Bridge Authority v. Cohen,433 A.2d 179, 182 (R.I. 1981); Leone v. Town of New Shoreham,534 A.2d 871, 873 (R.I. 1987). In connection with any such balancing equation, the court is obliged to consider, as an integral factor, the public interest.
Our Supreme Court has made it clear that the principal prerequisite to obtaining injunctive relief is the moving party's ability to prove that it is being threatened with some immediate irreparable injury for which no adequate remedy at law lies.Brown v. Amaral, supra, 460 A.2d 7, 10 (R.I. 1983),Paramount Office Supply Co. v. MacIsaac, 524 A.2d 1099, 1102 (R.I. 1987). Such irreparable injury must be either presently threatened or imminent. Injuries which are prospective in nature, or which might not occur, cannot form the basis for injunctive relief. R.I. Turnpike Bridge Authority v. Cohen, supra, 433 A.2d at 182.
The plaintiffs' principal allegations of irreparable harm can be distilled to essentially three:
 1. A loss of their ability to bargain collectively;
 2. A diminution of employee morale and personnel relations; and
 3. The loss of wages for ten days between now and the end of the fiscal year ending June 30, 1991;
First, with respect to the concern about erosion of employee morale and personnel relations, it is generally agreed that contract disputes, such as these cases present, are vexatious and often contentious. Such disputes, in and of themselves, almost invariably create an atmosphere of unrest among and between employees and employers. It must be recognized that every dispute between labor and management contains the seeds of human discord.Independent Oil Chemical Workers v. Proctor Gamble Mfg.Co., 864 F.2d 927, 929 (1st Cir. 1988).
Although the effect of the contemplated ten-day shutdown may exacerbate that disquietude and may further diminish morale and personnel interaction, one must ask: Does increased dampening of morale and employee/management relations, by itself, rise to the level of such irreparable harm and compelling injury so as to invite injunctive relief? It is the view here that it does not.
We turn, next, to the second claim of irreparable harm, the alleged loss of bargaining power, or, to use the vernacular of one union, the claimed loss of its "bargaining chips." (P.S.A. Dept. of Health, brief at 15.)
Both the unions as well as the State are apparently in accord that arbitration will be forthcoming, irrespective of this Court's decision to grant or deny injunctive relief. If the unions succeed in the arbitration proceedings, their claimed loss of bargaining ability becomes more illusory than real. As the State has properly pointed out, should the plaintiffs prevail at arbitration, they will effectively retain their bargaining position. That being so, the plaintiffs' claim of irreparable harm on this issue cannot be sustained.
The final contention is that the ten-day shutdown, and the concomitant loss of wages for those days, may irreparably impair the employees' economic ability to meet essential needs. This Court is not at all unsympathetic nor unmindful of the fact that the abridgement of a wage-earner's salary may cause disruptions in his or her everyday economic affairs. However, such disruptions, spread over a carefully considered 3-1/2 month period, do not even begin to approach the severe dislocations and fiscal adversities which will be sustained by a State employee who is or will be the target of a layoff, a remedial but more drastic measure which the unions themselves concede is available to the State.
Unquestionably, the loss of ten days' pay, even at periodic intervals, will pinch; and, for some it may be arduous and onerous. But, when considered against the financial adversities of those employees whose disengagements from the State payroll result from layoffs, a ten-day wage diminution, at measured and specified intervals, pales by comparison.
Further, and importantly, it must be borne in mind that a complaint relating to lost income is, in its essence, a claim for money damages. It is axiomatic in equity law that a claim for monetary damages will ordinarily not invite injunctive relief, as there is an adequate remedy at law.
Moreover, the plaintiffs in this case will have not only the capability but also the opportunity to present their substantive claims to an arbitrator. The courts have held that arbitration is a further safeguard and an adequate remedy at law, so long as the arbitration process is not rendered a nullity. E.g.,International Brotherhood v. Almac's, Inc., 894 F.2d 464, 465-66 (1st Cir. 1990) ("In the labor environment, the irreparable harm inquiry has come to focus on whether, without the injunction, the arbitration would become meaningless.").
"Irreparable injury," the courts have said, "does not mean simply any injury resulting from a breach of contract that would not be fully redressed by an arbitral award, but rather `injury so irreparable that a decision of the arbitrator in the union's favor would be but an empty victory.'" Id., at 465, n.2.
The arbitration process in the instant cases will not be rendered nugatory absent injunctive relief. In the event that the arbitrator rules in the unions' favor, that arbitrator can order a panoply of appropriate remedies, including back pay. Id. at 466. Moreover, unlike litigation in the courts, which may take years to resolve, arbitration proceedings can be readily had and expedited if necessary. As the First Circuit has aptly remarked, arbitration is a contractually-based device designed to permit dispute resolution without the time, trouble, trappings, and tariffs characteristic of legal actions. Independent Oil Chemical Workers v. Proctor Gamble, supra, 864 F.2d at 929[2].
I am persuaded that denial of the plaintiffs' request for injunctive relief will not, in the end, frustrate the arbitral process. There is insufficient reason to conclude that the plaintiffs cannot be made whole by means of money damages if they succeed in enforcing the arbitrator's awards. See, CentralMissouri Paving Co. v. United Mine Workers, 749 F. Supp. 973, 978 (E.D. Mo. 1990), Novak v. Commonwealth of Pennsylvania,523 A.2d 318, 321 (Pa. 1987) (holding that damage awards are adequate to rectify losses suffered by improperly furloughed employees.).
As noted earlier, in matters pertaining to requests for injunctive relief, the Court is also obliged to balance the equities between the parties. Accordingly, the Court must weigh the relief which the unions seek against the harm or damage which may redound to the disfavor of the State's legitimate interests. In making this determination the cases direct the court to be cognizant and mindful of the general public's interest, as well as examining the practicality of imposing the desired relief.R.I. Turnpike Bridge Authority v. Cohen, supra, 433 A.2d at 182.
The enormity of the cash flow deficiency presently confronting the State is not questioned. It is, according to the Director of Administration, in excess of $20 million. The plan which the State seeks to implement, which embraces the contemplated ten-day shutdown, would largely alleviate not only the cash flow crisis, but it would also substantially achieve the mandated goal of a balanced budget. A grant of the injunctive relief which the plaintiffs demand would, on balance, be far outweighed by the damaging impact upon the legitimate interests of the State and the public in general.
The budget must be balanced. The cash flow crisis must be stemmed. Imposition of the injunction which the unions seek would only augment the current economic and fiscal exigency.
This Court has, earlier herein, expressed its concern for the State employees who will be affected by the shutdown, and the Court renews that sentiment now. The Court, however, is simply not empowered to insulate these employees from the effects of what our President has conceded is a recession.
Countless numbers of employees in the private sector have been and continue to be subjected to widespread layoffs and shortened work weeks. Bankruptcies and receiverships are today outstripping business incorporations. The Northeast, and particularly Rhode Island, is suffering more than any other geographic area economically. The astronomical dislocations and deprivations which wage earners in private industry have been enduring are now unavoidably encroaching upon the public employees. Would that they could, but neither the State nor the courts can guarantee its employees safe harbor or refuge from the pernicious consequences of economic decline.
For all of the reasons stated, this Court is constrained to deny the unions' motions for injunctive relief.
[1] Cases 91-1735 and 91-1736 were filed this morning. Consequently, plaintiffs in these cases were not represented at yesterday's hearing. Counsel for the plaintiffs in these two cases has, however, represented to the Court that he was present in the courtroom yesterday and that the arguments he would have presented on behalf of his clients would generally have been cumulative to those already heard by the Court. Accordingly, he has agreed to have his two cases consolidated with the others and has waived further hearing on his motions therein.
[2] Since, as is held herein, the plaintiffs cannot surmount the requisite test of irreparable harm, the Court does not now reach nor decide whether the plaintiffs can demonstrate a probability of success on the merits as to the alleged abridgements of their various collective bargaining agreements. Those allegations should be presented to the arbitrator for determination on first impression. See, InternationalBrotherhood v. Almac's, Inc., 894 F.2d 464, 466 (1st Cir. 1990);see also, Central Missouri Paving Co. v. United Mineworkers,749 F. Supp. 973, 977 (E.D. Mo. 1990).