DECISION
This is a petition by the Department of Children, Youth and Families of the State of Rhode Island (the State) to vacate an arbitration award pursuant to G.L. 1956 (1986 Reenactment) §28-9-18 on the ground that the arbitrator exceeded his powers. The State argues that because the award fails "to draw its essence from the contract", and is not based on "a passibly plausible" interpretation of the contract, the award is not sustainable as a matter of law. See Jacinto v. Egan,120 R.I. 907, 391 A.2d 1173 (1978). Contrariwise, Rhode Island Alliance of Social Service Employees, Local 580, AFL-CIO (the Union) moves to confirm the award under the provisions of § 28-9-13, arguing that the award draws its essence from the contract and is a reasonable construction of the contract language and fashions a reasonable remedy for the grievance arbitrated.
On October 7, 1980 the State and the Union entered into an agreement, the execution and validity of which is not disputed. Paragraph 5 of that agreement provided:
 "Supervisory responsibility shall not exceed 6 caseworkers per supervisor. Every effort shall be made by the Department to not exceed a ratio of 5 workers to each supervisor."
On January 3, 1991 the Union filed a grievance alleging in substance that the State had failed to make "every effort" not to exceed a ratio of 5 workers to each supervisor. The arbitrator held hearings on November 26, 1991, May 19, 1992 and May 22, 1992. His initial award on September 14, 1992 found that the State had violated the caseload limitation in the agreement. He retained jurisdiction of the arbitration to fashion a remedy if the parties could not agree on one.
When the parties failed to agree on an appropriate remedy, the arbitrator on October 27, 1994 awarded the aggrieved supervisors additional compensation in an amount equal to one-fifth of the supervisor's salary for each month in which the supervisor supervised six social workers. The State petitioned on January 26, 1995 to vacate or modify the awards and to stay their enforcement pending hearing on its petition. The Union moved to confirm the awards on February 9, 1995. After consideration of the memoranda of the parties and hearing, the Court ordered a stay on March 9, 1995 and ordered briefing of the merits of the respective petitions and motions.
The State does not dispute the implied finding by the arbitrator that during the contract period some supervisors were required to supervise more than five social workers. Nor is it disputed that no supervisor was required to supervise more than six workers.
The initial questions which the arbitrator resolved were: What is the meaning of "every effort" as it is used in the agreement, and did the State make such effort?
The arbitrator held:
 "The phrase "every effort' is broad and elastic. But it is, nonetheless, meaningful. While the caseloads agreement does not mandate a five-to-one ratio of social workers to supervisors, the State's promise to make `every effort' to achieve that ratio imposes a heavy and urgent obligation on the State to meet that goal. Significantly, the parties did not use qualified phrases, such as `serious efforts,' or `good faith efforts,' or `reasonable efforts.' The phase `every effort' is imperative and unqualified."
Such plain talk needs no improvement.
The State argued that because of a "fiscal crisis" in 1991 it could not afford to appropriate sufficient funds, or release or transfer appropriated funds to the department to fund the implementation of the five supervisees per supervisor provision. Without deciding whether or not the "fiscal crisis" was of such a magnitude that neither the department, by re-allocating appropriated funds, nor the State, by supplemental appropriation or interdepartmental transfer, or otherwise, could fund the relatively insignificant cost of complying with a valid collective bargaining agreement, the arbitrator said:
 "Finally, the State's fiscal crisis in 1991 did not excuse its noncompliance with its collectively bargained obligations. To put it bluntly, a contract is a contract. The Union would not be entitled to demand better benefits during the life of the contract if the State were suddenly to enjoy an unexpected spurt of prosperity. And the State may not insist that the Union forgive explicit contract obligations because the State experienced unexpected fiscal problems. Under Rhode Island law, lack of funding or financial exigency does not excuse failure to comply with a collectively bargained obligation. Exeter-West Greenwich Regional School District v. Exeter-West Greenwich Teachers' Association, 489 A.2d 1010 (R.I. 1985)"
Although the arbitrator's reliance on Exeter-West Greenwich Regional School District may be misplaced, this Court endorses the principles espoused by the arbitrator.
It is not for the Union, the arbitrator, or the Court to second-guess the Governor's decisions as to how to deal with a "fiscal crisis." But neither the Governor, nor anyone else, should be permitted to escape the consequences of the violation of a lawful obligation. The parties could have agreed to a "force majeure" provision in their collective bargaining agreements. This caseload limit provision itself could have been conditioned upon the State's economic ability to comply.
The priority of contractual obligations over the emergency measures the Executive took to deal with the the fiscal situation in 1991 is suggested in the following language in the Supreme Court's opinion in In re State Employees Unions, 587 A.2d 919, 922 (R.I. 1991):
 "The petitioners assert that the trial justice erred in refusing to enjoin the shut-down since it allegedly violated the terms and conditions of outstanding collective-bargaining contracts that among other things set forth the hours and the days of the work week. The trial justice had issued a carefully crafted and thoughtful decision emphasizing the emergent conditions that justify the Governor's issuance of Executive Order No. 91-11. He found that this order was additionally authorized by the Legislature pursuant to G.L. 1956 (1990 Reenactment) § 35-3-16. He declared that the Legislature had authorized the Governor to reduce or suspend appropriations for all executive departments in order that a balanced budget be maintained. The petitioners assert that the trial justice either ignored or overlooked their arguments concerning constitutional violations arising out of the impairment of existing contracts. We are of the opinion that the trial justice did not overlook these arguments but declined to address them by reason of the fact that both parties had agreed that grievances arising out of the alleged breach of contract would be determined by arbitration. It appeared from the oral argument presented to this court that both parties reserve the question of breach of contract to the arbitration process as provided in all their collective-bargaining agreements. This agreement to arbitrate makes it unnecessary and, indeed, improper for this court to determine, at this stage of the proceedings, whether a breach of contract has occurred. The parties have not submitted this question either to the Superior Court or to this court.
 Consequently petitioners are in the somewhat anomalous position of arguing that we should assume, even without deciding, a breach of contract has occurred in order to issue an injunctive order without retaining jurisdiction to determine the dispute on its merits. We believe that the trial justice was well aware of his inability to proceed with the merits of the case since that portion of the litigation would in due course be submitted to arbitration. It was therefore difficult, if not impossible, to leap ahead to the determination of constitutional issues since those issues were dependent upon a mixed question of law and fact in determining whether the contracts were breached.
 As a result, the trial justice determined in essence that the plaintiffs below (the petitioners here) had an adequate remedy at law in the event that the arbitrators should decide in their favor. The arbitrators could well determine that the Governor's shutdown order was a device without legal effect in view of the contractual provisions that existed between the parties and award the members of the bargaining units their full compensation. In those circumstances the rights of petitioners' members would not be extinguished but merely deferred." (Emphasis supplied).
The rights of the aggrieved supervisors in this case to be compensated for the violation of their collective bargaining agreement was not extinguished by the unilateral conduct of the State but merely deferred until they were resolved by this arbitration.
The State argues that it cannot bargain away through collective bargaining the duty of its officers to carry out the law. Vose v. Brotherhood Correctional Officers, 587 A.2d 913
(R.I. 1991). In that case the Supreme Court held that the power of the director of corrections to require involuntary overtime from correctional employees to carry out his statutory duties to "[m]ake and promulgate necessary rules and regulations incidental to the exercise of his or her powers [to provide for]* * * safety, discipline, * * * care, and custody for all persons committed to correctional facilities," Section 42-56-10(v),
quoted in part Id., at 915, could not be stripped away by a collective bargaining agreement. The State says that the duty of the director of the Department of Children, Youth and Families not to outspend the appropriation to his department under §35-3-24 and the obligation of the Governor to balance the State's budget under § 35-3-16 may not be compromised by collective bargaining.
The Governor, or his designee, is equally obligated to bargain collectively with representatives of employees' collective bargaining agents and to reduce all agreements collectively bargained to a written contract. § 36-11-7. The October 7, 1980 agreement was such a contract. If the Governor, or his designee, had wished to withhold agreement because it was an issue which involved wages, he would have been free to do so and would not have been subject to mandatory binding arbitration.§ 36-11-9(c).
Considerable guidance is provided in another context by theAdvisory Opinion to the Senate, 108 R.I. 302, 275 A.2d 256
(1971). The Senate asked:
 "Can the general assembly or the budget officer, prior to the end of the fiscal year, reduce or withdraw unexpended balances of appropriations from the department of social welfare and the board of regents for education?" Id.
Although the Supreme Court answered the question propounded in the affirmative, as it related to the general assembly, its response was carefully subjected to constitutional limitations.
 "Thus, of immediate significance to the question at issue are the provisions of section 12 of article I of the constitution of this state and section 10 of article I of the Constitution of the United States. These sections expressly prohibit the General Assembly from adopting any act which has as its consequence the impairment of contracts. See Stokes v. Rodman, 5 R.I. 405 and Morley v. Lake Shore and M.S.Ry., 146 U.S. 162, 13 S.Ct. 54, 36 L.Ed. 925 (1892). Consequently, appropriations made to the Board of Regents and to the Department of Social Welfare by the adoption of P.L. 1970, chapter 138, may now be repealed only to the extent that such appropriations have not been expended or otherwise pledged to a binding executory contract entered into by the agencies involved.
 However, to what extent expenditures have been made or funds so pledged as to be constitutionally binding is a question of fact. Hence, before there can be a valid repeal by the General Assembly of funds theretofore, appropriated, there must be a factual determination of what remains in the general appropriation that is subject to recoupment. Moreover, such determination requires at least two approaches. It is well settled that when the Legislature makes a general appropriation, the agency involved enters into a contract with another, and the question of whether such contract is constitutionally protected is to be determined by the terms of that contract and not by the provisions of the act of appropriation. Keefe v. Clark, 322 U.S. 393, 64 S.Ct. 1072, 88 L.Ed. 1346.
 Moreover, although some states have held as in State ex rel. Board of Regents of Normal School v. Donald, supra, that the state like any individual can declare its intention to repudiate contracts, wholly or partially executory, leaving the other party to his right of recovery for damages, states so holding have a standing statute, granting their consent to be sued. We find no such general consent statute to be the law of this state. Thus, in Rhode Island, one allegedly sustaining damages as a result of this state's repudiation must seek special legislation giving the right to sue. Whether the General Assembly would grant such right in a given case is conjectural and this conceivably restricts the General Assembly from repealing an appropriation which the Board of Regents and/or the Department of Social Welfare have already allocated to a contract which, by its terms, may not constitutionally be impaired."
 108 R.I., at 305-06.
In the light of the Supreme Court's carefully articulatedcaveat, one may ask whether or not the Governor in this case was bound to allocate appropriated funds to satisfy valid contractual obligations, and whether or not the general assembly was equally bound to appropriate and raise the funds necessary to satisfy contractual obligations. The Supreme Court carefully noted that whether or not a contract is constitutionally protected is determined by the terms of that contract and not by the provisions of the act of appropriation. If the general assembly cannot constitutionally withdraw the funding of contractual obligations of the State, the governor surely cannot withhold such funding. The Court was able to finesse the impairment of contract argument in In re State Employees Unions,supra, by pointing out that whether or not any contract had been impaired by breach could be determined by arbitration. In this case the State has forced the raising of the impairment issue by denying these employees access to the arbitration proceeding, even if their contract has been breached.
Most recently our Supreme Court had occasion to consider the impairment of contracts clause in In re Advisory Opinion to theGovernor (Section 42-116-40 of DEPCO Act); R.I. DepositorsEconomic Protection Corporation v. Brown, No. 94-648-M.P., 94-668-M.P., slip op. at 21, (R.I. May 19, 1995). The Court referred to the three-part test for unconstitutional impairments of the obligation of contracts announced in Energy ReservesGroup, Inc. v. Kansas Power Light Co., 459 U.S. 400, 103 S.Ct. 697, 74 L.Ed.2d 569 (1983): First, has the state law in fact substantially impaired a contractual relationship? (Cite omitted.) Second, if the law constitutes a substantial impairment, can the state show a legitimate public purpose behind the regulation, "such as the remedying of a broad and general social or economic problem"? (Cite omitted.) Third, is the legitimate public purpose sufficient to justify the impairment of the contractual rights"? (Cite omitted.)
In this case, the answer to the first question is yes, but only if the Court were to hold that the grieving supervisors lost their right to the award of the arbitrator. Otherwise, the impairment is a relatively insubstantial delay in compliance with the contract for which all injured parties are fully compensated by the award and the remedy ordered.
If the award were to be vacated, the Court would have to consider the next two questions. A balanced budget is required by law in this State. The State argues with some merit that the hiring freeze in 1991, which prevented compliance with the caseload provision, had a legitimate public purpose for the remedying of a general economic problem. Finally, since the State did not utterly disavow its contractual obligation but only delayed compliance, its action can justifiably be said to have served a public purpose sufficient to outweigh the private interests of the supervisors. Important, too, is the economic remedy fashioned by the arbitrator and the relatively short period of the impairment.
Accordingly, the question was properly submitted to arbitration and the award was a reasonable, even ineluctable, one under the contract. Even if there was a fiscal crisis in 1991, it could not excuse the State indefinitely from its contractual obligations. It was required to make every effort, without limitation, to reduce supervisory caseloads. It did not.
Nothing in Vose, supra, requires a different result. In that case the director of the department of corrections decided, in carrying out the responsibility of his office that it was necessary to assign correctional officers to involuntary overtime in violation of a collective bargaining agreement which limited such assignments to emergencies. The decision in that case had nothing to do with the responsibility of executive officials not to outspend their appropriations or to bring expenditures into balance with revenues during a fiscal year. The director in that case was confronted with a situation whereby the agreement impeded his ability to carry out his governmental function. Nothing in the caseload agreement impedes the director from carrying out his governmental function with regard to the children, youth and families subject to the director's responsibility. Nothing in the agreements in this case means that a child, young person or family would not have the attention of the department through its social workers or that any social worker would be unsupervised, while it does appear that security posts might have been uncovered in the correctional institution, if that director had been bound by the agreement at issue in that case.
In Rhode Island Brotherhood of Correctional Officers v.State of Rhode Island, 643 A.2d 817 (R.I. 1994), our Supreme Court limited the range of applicability of Vose, supra:
 "Although it is true that there are certain narrow circumstances in which a supervisor, empowered by clearly delineated state law, must be allowed to act in a manner free of the constraints of the CBA [collective bargaining agreement], see, e.g., Vose and Rhode Island Laborers' District Council, both supra, the situation in the case at bar does not involve such a critical area of state power. The only question before the arbitrator was whether DiDonato's absence from his position without proper notice or medical documentation justified his dismissal. The resolution of this question does not interfere with the power of the director of the department to perform any essential aspect of his position. The issue at hand is clearly arbitrable." Id., at 822. (Emphasis supplied.)
None of these cases justify the State in taking the blanket position that it need not comply with the provisions of a collective bargaining agreement when it unilaterally decides that it cannot afford to comply because of a fiscal crisis.
II
The State argues further that the remedial award was unjustified, because it had reduced the supervisory caseload to five workers per supervisor by March 1992 in all but the case of one supervisor. As to that supervisor, according to the State, one worker had refused reassignment by asserting a contractual right not to be involuntarily reassigned. Apparently, the award will involve enhanced compensation for that supervisor after the State had hired sufficient supervisors by March of 1992 to reduce the caseload to five. One worker asserted her contractual right not to be assigned to a supervisor with less than five assigned workers.
This is precisely the kind of ground for interference with an arbitration award which is forbidden to the Courts.
The petition to vacate the award will be denied.
The motion to confirm the award will be granted.
The defendant will present an Order and Judgment, including costs, for entry on forty-eight hour notice to the plaintiff.