**In re STATE EMPLOYEES' UNIONS.**

**Nos. 91–102–M.P. to 91–110–M.P.
and 91–115–M.P.**

Supreme Court of Rhode Island.

March 14, 1991.

---

Thomas J. Liquori, Jr., Urso, Liguori & Urso, Westerly, for Professional Staff Ass'n of Dept. of Health, NEA and Probation and Parole Ass'n of Classified Employees, NEA.

Frank J. Cenerini, Warwick, for R.I. Alliance of Social Service Employees, Local 580.

Richard A. Skolnik, Lipsey & Skolnik, Providence, for R.I. Federation of Teachers, Federation of State Employed Nurses and Health Professionals and Howard Union of Teachers, Local 1171.

Gerard E. O'Neill, Wakefield, for R.I. Council 94, AFSCME, AFL–CIO.

Frederic A. Marzilli, East Providence, for Norman Miller, President Local 400, Intern. Federation of Professional & Technical Engineers.

Richard A. Fairbrothers, Providence, for R.I. Laborers' Dist. Council, Laborers' Intern. Union of North America, Zambarano Hosp. Employees, Local 1134, R.I. Judicial, Professional and Technical Employees Local 808 and Public Service Employees Local 1033.

Malcolm A. Najarian, Providence, for Linda DeMarco, as President of Local 79 of Ass'n of Nurses.

John A. Tarantino, Adler, Pollock & Sheehan, Barbara Grady, Asst. Atty. Gen., Sheldon Whitehouse, Chief Legal Counsel to Governor, Providence, for respondents.

## OPINION

WEISBERGER, Justice.

These are petitions for certiorari and injunctive relief pending determination of said petitions filed by a number of labor unions whose members are employed by the State of Rhode Island. Upon the filing of a number of these petitions by various unions, an oral argument was scheduled at which counsel for all parties set forth their respective positions on March 11, 1991. Thereafter an additional petition was filed by the president of local No. 79 of the National Association of Nurses, which has by request of counsel been added to the petitions to be considered by this court.

The State of Rhode Island and other respondents were given the opportunity to file a memorandum in opposition to petitioners' requests for issuance of a writ of certiorari and interim injunctive relief. This memorandum was filed on March 13, 1991.

All petitioners seek to review a decision rendered by a justice of the Superior Court which, in effect, denied preliminary injunctive relief to petitioners for alleged breaches of contractual obligations by the Governor of the State of Rhode Island and acts that were claimed to be ultra vires of the executive power. Allegedly the offending conduct by the Governor consisted of Executive Order No. 91–11 which was issued February 7, 1991. In pertinent part the Governor by this Executive Order, purporting to rely upon G.L.1956 (1988 Reenactment) chapter 11 of title 42, authorized the director of the Department of Administration "to effectuate a shutdown of all State departments and agencies subject to Executive Order for a total of 10 business days between this date and the end of the current fiscal year * * *."

The petitioners argued in the Superior Court as they argue here that this shutdown was beyond the executive power and was not authorized by any competent legislative action. They further argue that the shutdown infringes upon the judicial power of the state by causing courts to be inoperable as the result of the lack of logistical

and security support by employees who are subject to the Executive Order. They further argue that the ten-day shutdown is in violation of the numerous collective-bargaining agreements that have been entered into by and between the State of Rhode Island as employer and petitioners' unions as collective-bargaining entities. In support of this argument petitioners cite provisions in both the State and Federal Constitutions that prohibit impairment of the obligation of contract. This familiar principle has been recognized in a plethora of cases beginning with *The Trustees of Dartmouth College v. Woodward*, 17 U.S. (4 Wheat.) 518, 4 L.Ed. 629 (1819). There is no question that both the State and Federal Constitutions prohibit the impairment of contract by a law enacted by the State Legislature. U.S. Const. Art. I, sec. 10; *see* also *New Orleans Waterworks Co. v. Louisiana Sugar Refining Co.*, 125 U.S. 18, 30, 8 S.Ct. 741, 747, 31 L.Ed. 607, 612 (1888). Moreover article I, section 12, of the Rhode Island Constitution specifically provides that "[n]o * * * law impairing the obligation of contracts, shall be passed."

■ The petitioners assert that the trial justice erred in refusing to enjoin the shutdown since it allegedly violated the terms and conditions of outstanding collective-bargaining contracts that among other things set forth the hours and the days of the work week. The trial justice had issued a carefully crafted and thoughtful decision emphasizing the emergent conditions that justify the Governor's issuance of Executive Order No. 91–11. He found that this order was additionally authorized by the Legislature pursuant to G.L.1956 (1990 Reenactment) § 35-3-16. He declared that the Legislature had authorized the Governor to reduce or suspend appropriations for all executive departments in order that a balanced budget be maintained. The petitioners assert that the trial justice either ignored or overlooked their arguments concerning constitutional violations arising out of the impairment of existing contracts. We are of the opinion that the trial justice did not overlook these arguments but declined to address them by reason of the fact that both parties had agreed that grievances arising out of the alleged breach of contract would be determined by arbitration. It appeared from the oral argument presented to this court that both parties reserve the question of breach of contract to the arbitration process as provided in all their collective-bargaining agreements. This agreement to arbitrate makes it unnecessary and, indeed, improper for this court to determine, at this stage of the proceedings, whether a breach of contract has occurred. The parties have not submitted this question either to the Superior Court or to this court.

■ Consequently petitioners are in the somewhat anomalous position of arguing that we should assume, even without deciding, a breach of contract has occurred in order to issue an injunctive order without retaining jurisdiction to determine the dispute on its merits. We believe that the trial justice was well aware of his inability to proceed with the merits of the case since that portion of the litigation would in due course be submitted to arbitration. It was therefore difficult, if not impossible, to leap ahead to the determination of constitutional issues since those issues were dependent upon a mixed question of law and fact in determining whether the contracts were breached.

As a result, the trial justice determined in essence that the plaintiffs below (the petitioners here) had an adequate remedy at law in the event that the arbitrators should decide in their favor. The arbitrators could well determine that the Governor's shutdown order was a device without legal effect in view of the contractual provisions that existed between the parties and award the members of the bargaining units their full compensation. In those circumstances the rights of petitioners' members would not be extinguished but merely deferred.

Indeed the trial justice could well have concluded that by issuing injunctive relief, he would in effect have preempted the controversy. It is highly speculative to conclude that an arbitration process, including petitions to confirm an award, could be

completed before the end of the fiscal year. Such a result would prevent the Governor from testing the validity of his emergency action by making it impossible for him to take such action prior to the conclusion of the current fiscal year.

Therefore, we conclude that the trial justice was not in error in declining to enjoin the implementation of Executive Order No. 91–11 on contractual grounds.

■ Our analysis of the issues must include the arguments of some of petitioners that the Governor has trespassed upon the ability of a coequal branch of government, namely, the judiciary, to perform its constitutional and statutory functions. The independence of the judiciary was declared in ringing tones by Chief Justice Ames in the seminal case *Taylor v. Place*, 4 R.I. 324 (1856). It is argued by counsel for the Governor that the shutdown authorized by the Executive Order does not infringe upon the judicial power. He cites *Lemoine v. Martineau*, 115 R.I. 233, 342 A.2d 616 (1975), for the proposition that the exercise of judicial power primarily consists of the control of a decision in a case or the sole right to alter a decision once made. The narrow issue in *Lemoine* was whether the Legislature might interfere with the judicial power by exempting a member of the Legislature (albeit a lawyer) from appearing before the court, at his or her option, during a legislative session. It is obvious that no such attempt is made by the Governor in respect to the shutdown.

However, the courts of this state cannot feasibly operate without logistical and security support from State Marshals who are employed by the Department of Corrections and deputy sheriffs who are also controlled by the executive. Making these persons unavailable for a period of ten days, and particularly during certain of those days, might well effectively prevent courts of first instance from arraigning and setting bail for hundreds of persons who might be held overnight by the various police departments of our state or in the Adult Correctional Institutions. Trial courts may have literally hundreds of cases assigned to a date upon which a shutdown has been ordered. These cases may not be readily assigned to a succeeding day.

As troublesome as these issues may be, we are of the opinion that petitioners do not have standing to seek injunctive relief on this element of their complaint. The chief justice of the Supreme Court is the executive head of the judicial system. In the event that the operation of the court system is grievously affected by shutdown orders that may not take into account the unique problems of the judicial system, the chief justice or his designee, the court administrator, may seek appropriate injunctive relief from the Superior Court. No such request was before the trial justice, and therefore, he did not consider the question of invading the powers of the judiciary in the context in which the question was presented. He did not err in declining to issue an injunction to vindicate the judicial power of the state.

Constraints of time dictate that this opinion not be discursive. However, the decision of the trial justice contains many pertinent findings and conclusions that we adopt. That decision is appended to this opinion as appendix A.

For the reasons stated, the petitions for certiorari are hereby denied and no writ of certiorari shall issue. It follows that the request for injunctive relief is denied as well.

FAY, C.J., and KELLEHER, J., did not participate.

APPENDIX A

Filed: March 7, 1991

STATE OF RHODE ISLAND AND PROVIDENCE PLANTATIONS

PROVIDENCE, S.C.

SUPERIOR COURT

In re State Employees' Unions

91–1643, 91–1658, 91–1659, 91–1660, 91–1728, 91–1672, 91–1682, 91–1684, 91–1735, 91–1736

DECISION

KRAUSE, J.

Plaintiffs in the above-entitled actions are unions whose members are employees

of the State of Rhode Island. Their several complaints, which by agreement have been consolidated for purposes of these proceedings, are directed to Executive Order No. 91–11, issued by the Governor of this State on February 7, 1991.[1]

In the first instance, the unions challenge the Governor's constitutional and legislative authority to promulgate the Order, and particularly its directive to cause shutdowns for ten days between now and the end of the current fiscal year, June 30, 1991.

Secondly, the plaintiffs contend that even if the Order is not constitutionally or legislatively infirm, they are nonetheless entitled to injunctive relief from the planned shutdowns.

### The Constitutional Issue

■ It is not disputed that the State is presently confronted with a budget deficit of massive proportions. Nor is it questioned that the State is grappling with a near paralyzing cash flow crisis which, if not immediately alleviated, will have devastating consequences, including the State's inability to meet its payroll obligations.

In an effort to cure these fiscal ills, as well as to adhere to a mandate to balance this State's budget, the Governor issued the Executive Order which is the subject of the complaints herein. At issue is the Governor's constitutional and legislative authority upon which to base his directive that employees answerable to the Executive Branch of State government be subjected to intermittent shutdowns for ten business days without pay.

The ten designated shutdown days are not compressed in consecutive fashion. Rather, it is contemplated that the shutdowns will fall intermittently within the span of the remainder of this fiscal year

(March, 4 days; April, 3 days; May, 2 days; June, 1 day). The targeted days will or have been posted so that the affected employees will have advance notice of the cessations and can plan accordingly.

A hearing on the plaintiffs' challenges to the shutdown program was held before this Court on March 6. The Court has been directed to various constitutional and statutory citations, as well as to numerous judicial decisions, briefs, affidavits, and other exhibits to the pleadings, all of which are a matter of record and need not be further recited here.

At the outset, the unions contend that the Governor's power is restricted and limited, and that it is subservient to a much stronger Legislative Branch. Counsel for the State disputes this contention, arguing that the Legislative, Executive, and Judicial arms of the State are co-equal branches of government.

This Court finds it neither necessary nor productive to engage in a protracted discussion to determine which of these triumvirs, if any, is mightier than the next. The only question which the Court must presently decide is whether the Governor has, at least, the authority to implement the planned shutdowns which are contemplated in Executive Order 91–11. The Court is satisfied that he does.

The Constitution mandates that the Governor be vested with chief executive power within the State, and that he must ensure that the State's laws be faithfully executed. R.I. Const., Art. 9, §§ 1, 2. The legislature has also provided the Governor with the power, through his appointed Director of Administration, to prepare and administer the State's budget. § 42–11–2(a)(b), RIGL.

Further, pursuant to § 35–3–16, RIGL, the legislature has authorized the Governor to reduce or suspend appropriations for all Executive departments in order that a balanced budget be maintained.

---

1. Cases 91–1735 and 91–1736 were filed this morning. Consequently, plaintiffs in these cases were not represented at yesterday's hearing. Counsel for the plaintiffs in these two cases has, however, represented to the Court that he was present in the courtroom yesterday and that the arguments he would have presented on behalf of his clients would generally have been cumulative to those already heard by the Court. Accordingly, he has agreed to have his two cases consolidated with the others and has waived further hearing on his motions therein.

Upon those authorities, and upon a review of the affidavits of Mssrs. Baird and Sasse, and the exhibits thereto, the Court is persuaded that there has been delegated to the Governor, both expressly and impliedly, the authority and discretion to effectuate personnel cost reductions throughout the Executive Branch of State government, including the contemplated shutdowns.

The implementation of those personnel cost reductions, *i.e.*, what the State has referred to as the "hard choices" necessary and attendant to such reductions, devolved to the Governor. Plainly, the legislature did not pass but the hilt of the sword to the Governor and, at the same moment, retain its blade. To the contrary, the legislature assigned and conveyed the saber and its cutting edge to the Governor with the authority to use it suitably in order to cut the State's deficit and to bring the State's budget to level balance.

It does not appear to the Court that the Governor has wielded the sword unsuitably or in arbitrary and capricious fashion. The contemplated shutdowns are scheduled at periodic intervals in an effort to exact the least impact on the affected employees. Nor do these temporary work cessations follow in consecutive order so as to occlude a department's operations for any extended period of time.

Charged, as he is by the Constitution, to ensure that the laws of this State are faithfully carried out, and having a mandate to administer as well as to balance the budget, and being armed with recent legislation enabling him to effectuate personnel cost reductions to defray the deficit and cure a cash flow crisis, it follows that the shutdowns are a logical, rational, and constitutionally permissible step by the Chief Executive in accordance with a valid and legitimate interest of the State.

### The Injunction Issue

■ An injunction is "an extraordinary remedy." *Brown v. Amaral*, 460 A.2d 7, 10 (R.I.1983). Before a trial court will exercise its discretion to issue an injunction, the moving party must affirmatively demonstrate that it will probably succeed on the merits of its claim and that it will suffer immediate irreparable harm absent injunctive relief. Further, the movant must persuade the court that it has no adequate remedy at law. Importantly, the court must balance the equities between the parties: the relief which is sought must be weighed against the harm which would be visited upon the other party if an injunction were to be granted. *R.I. Turnpike & Bridge Authority v. Cohen*, 433 A.2d 179, 182 (R.I.1981); *Leone v. Town of New Shoreham*, 534 A.2d 871, 873 (R.I.1987). In connection with any such balancing equation, the court is obliged to consider, as an integral factor, the public interest.

■ Our Supreme Court has made it clear that the principal prerequisite to obtaining injunctive relief is the moving party's ability to prove that it is being threatened with some immediate irreparable injury for which no adequate remedy at law lies. *Brown v. Amaral, supra*, 460 A.2d 7, 10 (R.I.1983), *Paramount Office Supply Co. v. MacIsaac*, 524 A.2d 1099, 1102 (R.I. 1987). Such irreparable injury must be either presently threatened or imminent. Injuries which are prospective in nature, or which might not occur, cannot form the basis for injunctive relief. *R.I. Turnpike & Bridge Authority v. Cohen, supra*, 433 A.2d at 182.

■ The plaintiffs' principal allegations of irreparable harm can be distilled to essentially three:

1. A loss of their ability to bargain collectively;

2. A diminution of employee morale and personnel relations; and

3. The loss of wages for ten days between now and the end of the fiscal year ending June 30, 1991;

First, with respect to the concern about erosion of employee morale and personnel relations, it is generally agreed that contract disputes, such as these cases present, are vexatious and often contentious. Such disputes, in and of themselves, almost invariably create an atmosphere of unrest among and between employees and employers. It must be recognized that every dis-

pute between labor and management contains the seeds of human discord. *Independent Oil & Chemical Workers v. Proctor & Gamble Mfg. Co.*, 864 F.2d 927, 929 (1st Cir.1988).

Although the effect of the contemplated ten-day shutdown may exacerbate that disquietude and may further diminish morale and personnel interaction, one must ask: Does increased dampening of morale and employee/management relations, by itself, rise to the level of such irreparable harm and compelling injury so as to invite injunctive relief? It is the view here that it does not.

We turn, next, to the second claim of irreparable harm, the alleged loss of bargaining power, or, to use the vernacular of one union, the claimed loss of its "bargaining chips." (P.S.A. Dept. of Health, brief at 15.)

Both the unions as well as the State are apparently in accord that arbitration will be forthcoming, irrespective of this Court's decision to grant or deny injunctive relief. If the unions succeed in the arbitration proceedings, their claimed loss of bargaining ability becomes more illusory than real. As the State has properly pointed out, should the plaintiffs prevail at arbitration, they will effectively retain their bargaining position. That being so, the plaintiffs' claim of irreparable harm on this issue cannot be sustained.

The final contention is that the ten-day shutdown, and the concomitant loss of wages for those days, may irreparably impair the employees' economic ability to meet essential needs. This Court is not at all unsympathetic nor unmindful of the fact that the abridgement of a wage-earner's salary may cause disruptions in his or her everyday economic affairs. However, such disruptions, spread over a carefully considered 3½ month period, do not even begin to approach the severe dislocations and fiscal adversities which will be sustained by a State employee who is or will be the target of a layoff, a remedial but more drastic measure which the unions themselves concede is available to the State.

Unquestionably, the loss of ten days' pay, even at periodic intervals, will pinch; and, for some it may be arduous and onerous. But, when considered against the financial adversities of those employees whose disengagements from the State payroll result from layoffs, a ten-day wage diminution, at measured and specified intervals, pales by comparison.

Further, and importantly, it must be borne in mind that a complaint relating to lost income is, in its essence, a claim for money damages. It is axiomatic in equity law that a claim for monetary damages will ordinarily not invite injunctive relief, as there is an adequate remedy at law.

Moreover, the plaintiffs in this case will have not only the capability but also the opportunity to present their substantive claims to an arbitrator. The courts have held that arbitration is a further safeguard and an adequate remedy at law, so long as the arbitration process is not rendered a nullity. *E.g.*, *International Brotherhood v. Almac's, Inc.*, 894 F.2d 464, 465–66 (1st Cir.1990) ("In the labor environment, the irreparable harm inquiry has come to focus on whether, without the injunction, the arbitration would become meaningless.").

"Irreparable injury," the courts have said, "does not mean simply any injury resulting from a breach of contract that would not be fully redressed by an arbitral award, but rather 'injury so irreparable that a decision of the arbitrator in the union's favor would be but an empty victory.'" *Id.*, at 465, n.2.

The arbitration process in the instant cases will not be rendered nugatory absent injunctive relief. In the event that the arbitrator rules in the unions' favor, that arbitrator can order a panoply of appropriate remedies, including back pay. *Id.* at 466. Moreover, unlike litigation in the courts, which may take years to resolve, arbitration proceedings can be readily had and expedited if necessary. As the First Circuit has aptly remarked, arbitration is a contractually-based device designed to permit dispute resolution without the time,

trouble, trappings, and tariffs characteristic of legal actions. *Independent Oil & Chemical Workers v. Proctor & Gamble, supra,* 864 F.2d at 929 [2].

I am persuaded that denial of the plaintiffs' request for injunctive relief will not, in the end, frustrate the arbitral process. There is insufficient reason to conclude that the plaintiffs cannot be made whole by means of money damages if they succeed in enforcing the arbitrator's awards. *See, Central Missouri Paving Co. v. United Mine Workers,* 749 F.Supp. 973, 978 (E.D. Mo.1990), *Novak v. Commonwealth of Pennsylvania,* 523 A.2d 318, 321 (Pa.1987) (holding that damage awards are adequate to rectify losses suffered by improperly furloughed employees.).

As noted earlier, in matters pertaining to requests for injunctive relief, the Court is also obliged to balance the equities between the parties. Accordingly, the Court must weigh the relief which the unions seek against the harm or damage which may redound to the disfavor of the State's legitimate interests. In making this determination the cases direct the court to be cognizant and mindful of the general public's interest, as well as examining the practicality of imposing the desired relief. *R.I. Turnpike & Bridge Authority v. Cohen, supra,* 433 A.2d at 182.

The enormity of the cash flow deficiency presently confronting the State is not questioned. It is, according to the Director of Administration, in excess of $20 million. The plan which the State seeks to implement, which embraces the contemplated ten-day shutdown, would largely alleviate not only the cash flow crisis, but it would also substantially achieve the mandated goal of a balanced budget. A grant of the injunctive relief which the plaintiffs demand would, on balance, be far outweighed by the damaging impact upon the legitimate interests of the State and the public in general.

The budget must be balanced. The cash flow crisis must be stemmed. Imposition of the injunction which the unions seek would only augment the current economic and fiscal exigency.

This Court has, earlier herein, expressed its concern for the State employees who will be affected by the shutdown, and the Court renews that sentiment now. The Court, however, is simply not empowered to insulate these employees from the effects of what our President has conceded is a recession.

Countless numbers of employees in the private sector have been and continue to be subjected to widespread layoffs and shortened work weeks. Bankruptcies and receiverships are today outstripping business incorporations. The Northeast, and particularly Rhode Island, is suffering more than any other geographic area economically. The astronomical dislocations and deprivations which wage earners in private industry have been enduring are now unavoidably encroaching upon the public employees. Would that they could, but neither the State nor the courts can guarantee its employees safe harbor or refuge from the pernicious consequences of economic decline.

For all of the reasons stated, this Court is constrained to deny the unions' motions for injunctive relief.

---

**2.** Since, as is held herein, the plaintiffs cannot surmount the requisite test of irreparable harm, the Court does not now reach nor decide whether the plaintiffs can demonstrate a probability of success on the merits as to the alleged abridgements of their various collective bargaining agreements. Those allegations should be presented to the arbitrator for determination on first impression. *See, International Brotherhood v. Almac's, Inc.,* 894 F.2d 464, 465–66 (1st Cir.1990); *see also, Central Missouri Paving Co. v. United Mineworkers,* 749 F.Supp. 973, 977 (E.D.Mo.1990).