DECISION
The complaint in this case was filed on August 1, 2008. The complaint is a three-count complaint in which the Plaintiff challenges the legality of Executive Order No. 08-06, signed by Defendant Governor Donald L. Carcieri on July 31, 2008.
Shortly after the complaint was filed, the Plaintiff requested a Super. R. Civ. P. 16 pre-trial chambers conference with the Court. During the conference, the parties agreed to a briefing schedule on Plaintiff's anticipated motions for temporary restraining order and preliminary injunction. Also during the conference, the Defendant voluntarily agreed to delay implementation of Executive Order No. 08-06 so as to give the parties the opportunity to fully brief the questions presented and to give the Court the opportunity to give full consideration to the issues raised by the parties. A similar Rule 16 conference was held on August 7, 2008 and, thereafter, the parties did not object to the Court's determination that the matter should be advanced on the merits and consolidated with the requests for temporary and preliminary injunctive relief. See Super. R. Civ. P. 65. The last of the parties' memoranda and arguments were filed on August 12, 2008.
The facts are not in dispute and the matter can be decided on the pleadings and exhibits thereto, with judgment entered pursuant to Super. R. Civ. P. 57 and 58. *Page 2 
 I Facts and Travel
The genesis of this dispute is Public Laws 2008, ch. 100 — the recently enacted state budget act. The budget included a $422 million deficit (Pl.'s Ex. B, Def.'s Ex. G, Order dated July 31, 2008), which the Rhode Island General Assembly ("Legislature") enacted, relying upon the Governor's proposed $60.6 million savings in personnel costs. The Governor represented to the Legislature that he could secure these savings partly through negotiations with the State employees' labor unions, permanent position eliminations, layoffs, and by ordering governmental shutdowns in the form of uncompensated leave days for all state employees. (Executive Summary, Rhode Island Governor's Proposed Budget for FY 2009, at 7-8.) The Governor signed the budget into law on June 26, 2008. See P.L. 2008, ch. 100.
Before the deficit-laden budget became law on June 26, 2008, the Governor began his attempts to make up the anticipated shortfall.[1]
He successfully raised some revenue by convincing the membership of several of the state's labor unions to pay more for their health insurance. The Plaintiff Rhode Island Council 94, A.F.S.C.M.E., AFL-CIO ("Council 94" or "the Union") was one of the unions with which the Governor attempted to negotiate a payment increase. While those negotiations were pending, the Governor announced he was terminating Council 94's collective bargaining agreement. (Def.'s Ex. F, letter dated June 16, 2008.) When Council 94 rejected the Governor's plan to increase its employees' health-care premiums, the Governor then announced he would not engage *Page 3 
in further negotiations with Council 94. (Pl.'s Ex. E, press release dated July 25, 2008.) In response, on July 28, 2008, the union filed an unfair labor practice charge with the Rhode Island State Labor Relations Board ("Labor Relations Board"); the claim is now pending before the Labor Relations Board as ULP 5917. (Plf.'s Ex. G, unfair labor practice complaint dated July 28, 2008.) The essence of the charge is that the State, acting through the Governor, refused to engage in collective bargaining and committed unfair labor practices in violation of G.L. 1956 § 36-11-1 et seq., and G.L. 1956 §§ 28-7-13 and 28-7-13.1.
Thereafter, on July 31, 2008, the Governor issued Executive Order No. 08-06, which is aimed at a number of the state's labor unions.[2]
Facially, the Executive Order is not limited to executive department employees and the Governor does not dispute that his order is intended to affect all of Council 94's workers, including those employed in other branches of government. The Executive Order includes language stating:
 "Whereas, the failure of the employees of the Unions to ratify the co-share and plan design changes for fiscal year 2009 will cause the state's expenditures to exceed the appropriations, in violation of the mandates of the 2009 fiscal year budget passed by the legislature and signed by the Governor and the Rhode Island Constitution, and further deepening the current economic and fiscal crisis facing the State." (Pl.'s Ex. B, Def.'s Ex. G, Executive Order dated July 31, 2008.) *Page 4 
Thus, the Governor all but blamed the budget deficit on the state's unions, accused them of violating the Constitution for failing to go gently into the night of a pay reduction, and laid out the legal reasoning behind his use of executive power against the unions.
The Executive Order, if implemented, will reduce all of the affected unions' workers' pay based upon a formula that is tied to their income and the nature of their health care plans, individual or family.Id. Although the actual dollar amounts to be taken from each employee's pay might seem, to some, inconsequential, Council 94's members viewed the anticipated pay cut as intolerable in the current economic climate of rising consumer prices, including sharply increasing food and energy costs, and higher property taxes. Equally as importantly, the Union balked at the notion that the Governor could enact a budget deficit and then leverage the state's fiscal ills into the basis for suspending state labor relations laws, ignoring state and federal constitutional prohibitions against impairment of contract, and exercising authority over workers employed in branches of government other than his own.
As a result of the Governor's Executive Order, Council 94 filed the instant action challenging the Governor's authority to effectuate a change in pay unilaterally. Within ten days after Council 94's filing of its complaint, two other unions followed suit with the potential that more of the affected unions will do the same. Although the Union's complaint is sparse, the Union clearly sets forth a labor-law based challenge to the Governor's actions and it claims the Governor has acted in violation of the Distribution of Powers amendment to Rhode Island Constitution (R.I. Const. art. 5), as well as the Contracts Clauses of the state and the federal Constitutions (R.I. Const. art. 1, sec. 12 and U.S. Const., art. I, § 10, respectively). The Union asks the Court for findings or *Page 5 
declarations thereon and for injunctive relief in the form of an order restraining and enjoining the Governor from implementing Executive Order No. 08-06. In their memoranda, both parties focus predominantly on the underlying labor law issues, but also raise the broader questions pertaining to the chief executive's constitutional powers, thereby placing those questions squarely before this Court. In his memoranda, Governor Donald L. Carcieri presses this Court to agree that his inherent powers as the state's chief executive officer transcend constitutional separation of powers principles and trump state law.
 II Jurisdiction
The Superior Court has original jurisdiction of at least part of this controversy pursuant to G.L. 1956 §§ 8-2-13 and 8-2-14 and G.L. 1956 § 9-30-1 et seq. (Uniform Declaratory Judgment Act). The Uniform Declaratory Judgment Act ("UDJA") vests the Superior Court with "the power to declare rights, status, and other legal relations whether or not further relief is or could be claimed." Section 9-30-1; see alsoP.J.C. Realty v. Barry, 811 A.2d 1202, 1207 (R.I. 2002) (quoting § 9-30-1). "The UDJA gives a broad grant of jurisdiction to the Superior Court to determine the rights of any person that may arise as a part of its original jurisdiction." Canario, 752 A.2d at 479 (citing Roch v.Harrahy, 419 A.2d 827, 830 (R.I. 1980)). Further, the purpose of the UDJA is "to allow the trial justice to `facilitate the termination of controversies.'" Bradford Assocs. v. R.I. Div. of Purchases,772 A.2d 485, 489 (R.I. 2001) (citations omitted). The Court's declarations "shall have the force and effect of a final judgment or decree."Id. *Page 6 
 III Constitutional and Legislative Backdrop
The starting point must be the centerpiece of the state government power structure — the Constitution of Rhode Island, adopted in 1842 ("Rhode Island Constitution").
Article 9, section 1 of the Rhode Island Constitution vested the state's executive powers in a governor. Simply defined, the executive is the administrator who is charged with the detail of carrying the state's laws into effect. See Black's Law Dictionary 610 (8th ed. 2004).
Article 9, section 1 was interpreted by the Rhode Island Supreme Court in 1932 in the case of Gorham v. Robinson, 57 R.I. 1, 186 A. 832 (1937). In that case, our Supreme Court strictly construed article 9, pointing out that the Rhode Island Constitution expressly gave the state's governor few executive powers. Gorham, 57 R.I. at 17, 186 A. at 841. Other than the power to carry out the state's laws, the Rhode Island Constitution gave the state's executive no more power than to affect pardons and reprieves; convene and adjourn the general assembly; fill temporary vacancies in public offices; and command the military in times of war. See R.I. Const. of 1842 art. 7, secs. 3, 4, 5, 6 and 7. Thus, the framers of the Rhode Island Constitution, consistent with an historical distrust of the Crown, created a state power structure with a weak executive and left most of the state's power with the people, i.e., the state legislature. See In re Advisory Opinion to the Governor,732 A.2d 55, 64 (R.I. 1999) ("Rhode Island's history is that of a quintessential system of parliamentary supremacy.") *Page 7 
In 1935, the Legislature passed the Administrative Code Act as part of its earliest efforts to organize the State's power structure into departments and assign certain functional tasks and responsibilities to those departments. See P.L. 1935, ch. 2250; P.L. 1935, ch. 2188. In that context, the Legislature expressly created an executive department and placed the governor at its head. See P.L. 1935, ch. 2250, § 10; P.L. 1939, ch. 660, § 10 (codified as amended at G.L. 1956 § 42-7-1). That provision, in prior iterations and in its present form, specifically references article 9 of the Rhode Island Constitution when acknowledging the governor's powers. See § 42-7-1 ("The governor shall have all powers and duties provided by R.I. Const., Art. IX."); P.L. 1935 ch. 2250, § 10; P.L. 1939 ch. 660, § 10. So, although the Legislature created an executive department, it was careful not to restrict the governor's powers nor delegate any of its own power to him.
Then, in 1951, the Legislature created a Department of Administration within the executive branch of government. See P.L. 1951, ch. 2727, art. 1, § 1 (codified as amended at G.L. 1956 § 42-11-1). When creating the Department of Administration, the Legislature continued to define and assign a host of functional tasks, all of which are within the constitutionally defined parameters of executive power. Title 42, as first enacted, and in its present form, can be read quite consistently with the power structure and executive powers established by the Rhode Island Constitution. In other words, the organizational structure created by the Legislature in enacting and amending title 42 corresponds neatly with the administrative and operational functions attendant to administering the state's laws. So, too, title 42 does not explicitly delegate any legislative powers to the chief executive and, to the extent title 42 can be read to contain implied *Page 8 
delegations of legislative power, it confines and guides the executive department's use of that power.[3]
Over the years, the Legislature further detailed the functional tasks of the chief executive and the Department of Administration in a wide variety of matters ranging from administering the public finance and the state employees' merit system to maintaining the state's buildings.See, e.g., G.L. 1956 chapter 1 of title 35 (governing the fiscal functions of the Department of Adminstration); G.L. 1956 chapter 3 of title 35 (governing the Department of Administration's budget preparation process); G.L. 1956 chapters 3 and 4 of title 36 (establishing a merit system for state employees); G.L. 1956 chapter 8 of title 37 (governing the maintenance and supervision of public buildings). Thus, the Legislature gave form and direction to the executive branch's administrative bureaucracy without expanding the governor's historically limited constitutional powers. Included among the legislatively assigned obligations are those at issue here, i.e., the obligation to recognize and collectively bargain with the state employees' bargaining agents; to submit unresolved issues to mediation; and to proceed to binding arbitration in the absence of conciliation.See G.L. 1956 §§ 36-11-1, 36-11-7, 36-11-8, and 36-11-9.
Then, in 1990, as part if its appropriations legislation, the Legislature re-enacted G.L. 1956 § 35-3-16, entitled "Reduction or suspension of appropriations to maintain balanced budget." See P.L. 1990, ch. 65, art. 41, § 1. Section 35-3-16 contained a specific delegation of power and purported to give the governor the authority to reduce or suspend appropriations for any or all of the departments, excepting the General *Page 9 
Assembly, legislative agencies, and legislative committees and commissions, for the purpose of balancing the budget. Based upon that authority, then-Governor Bruce Sundlun attempted[4] to reduce state employees' pay through the expediency of government shutdowns — shutdowns that implicated the judiciary because they affected the State Marshals and deputy sheriffs whose services are critical to the functioning of the judiciary, but who are employed by the executive department. See In re State Employees' Unions, 587 A.2d 919, 921, 923
(R.I. 1991).
In response to Governor Sundlun's shut-down order, various state employees' unions filed suit seeking an injunction. See In re StateEmployees Unions, No. P.C. 91-1643, 1991 R.I. Super. LEXIS 186 (Mar. 7, 1991). The Superior Court denied the request for injunctive relief without addressing any separation of powers questions, and concluded in part, "[f]urther, pursuant to § 35-3-16, RIGL, the legislature has authorized the Governor to reduce or suspend appropriations for all Executive departments in order that a balanced budget be maintained."Id. at *4. The unions filed a petition for writ of certiorari with the Rhode Island Supreme Court, which was denied on account of those unions' lack of standing. However, in a concededly hurried decision, the Supreme Court seized upon the lurking separation of powers question presented by Governor Sudlun's actions and held, "[o]ur analysis of the issues must include the argument of petitioners that the Governor has trespassed upon the ability of a coequal branch of government, namely the judiciary, to perform its constitutional and statutory functions. The independence of the judiciary was declared in ringing tones by Chief Justice Ames in the seminal case Taylor v. Place, 4 R.I. 324 (1856)."In re State Employees' Unions, *Page 10 587 A.2d 919, 921 (R.I. 1991). The Court pointed out that "the courts of this state cannot feasibly operate without logistical and security support from State Marshals who are employed by the Department of Corrections and deputy sheriffs who are also controlled by the executive." Id. The Court went on to warn,
 "[t]he chief justice of the Supreme Court is the executive head of the judicial system. In the event that the operation of the court system is grievously affected by shut down orders that may not take into account the unique problems of the judicial system, the chief justice or his designee, the court administrator, may seek appropriate injunctive relief from the Superior Court." Id.
Although the Court adopted the trial justice's reasoning insofar as it went, the Court also pointed out that the trial justice "did not consider the question of invading the powers of the judiciary in the context in which the question was presented" and, therefore, "did not err in declining to issue an injunction to vindicate the judicial power of the state." Id. Importantly, then, the Court recognized that even where the governor's actions are aimed at cost-cutting within hisown department, those actions may not impair the functioning of the other branches of government.
The Constitution was amended again in 1992. At that time, the electorate approved an amendment that imposed limits on state spending.See R.I. Const. art. 9, secs. 16 and 17. Because of that amendment, it is often said that the governor has the obligation to maintain a balanced budget. However, that statement oversimplifies the amendment. Section 15 of article 9 requires the governor to prepare and present a budget to the general assembly. Section 16, as presently adopted, prohibits the governor from making appropriations or signing into law any budget act that exceeds ninety-eight percent of the estimated state revenues from all sources. Section 17 establishes a reserve *Page 11 
account in the event of certain emergencies from which the governor cannot appropriate without legislative consent. Sections 16 and 17 are clear and unambiguous.[5] By their plain language, they are prohibitory in nature and obviously aimed at preventing planned deficits. Taken together with Section 15, which places the burden of preparing the budget on the governor, these three sections create a system of checks and balances on legislative appropriation and gubernatorial spending. By their plain language, these prohibitions neither impose an affirmative duty upon the governor to maintain the state's finances in a balanced state at all or nearly all times during the course of any fiscal year, nor do they bestow new or additional powers upon the governor whether for the purpose of making up budgetary shortfalls or otherwise. On the other hand, there is nothing contained in Sections 15, 16, or 17 that impair the governor's lawful exercise of authority in undertaking responsible cost-cutting measures within his department, be it with an eye toward the current year's appropriations or subsequent years' budgets.
In 1997, the Legislature repealed the constitutionally dubious § 35-3-16 and, in 2004, eliminated any remaining confusion about the executive branch's authority over the legislative and judicial branches of government by enacting P.L. 2004, ch. 595, art. 45, which, among other things, removed the appointment, promotion, salaries, tenure, and dismissal of the other branch's employees from the control of the executive branch; placed all matters relating to Court administration in the hands of the judiciary; prevented the governor from controlling the other branches through financial starvation; and limited *Page 12 
the authority of the executive department's unclassified pay plan board to executive department employees. See, P.L. 2004, ch. 595, art. 45, §§ 1, 3, 4 and 5.
The Constitution was amended again in 2004, this time to include the Distribution of Powers amendment. See R.I. Const., art. 5. The amendment more clearly demarked the distribution of the state's power structure among the executive, legislative, and judicial branches of government by designating those departments as separate and distinct. Article 5 did not expressly expand the governor's historically limited Constitutional powers, limit his administrative authority to manage his departmental bureaucracy, or limit his authority to execute other legislatively-assigned tasks. The Distribution of Powers amendment, however, did help to reset the parameters of the governor's constitutional powers, to the extent previously muddied by the repealed § 35-3-16. The 2004 amendment to the Constitution also gave the state's chief executive powers of appointment over all officers of the state who exercise executive authority under the laws of the State, somewhat releasing the executive branch from the clutches of legislative supremacy. See R.I. Const., art. 9, sec. 5 (entitled "Powers of appointment"). By its plain language, that authority is limited and, for present purposes, is irrelevant.
Thus, at the dawn of the new century, the chief executive's constitutional powers to dominate the other branches of government or to supersede the State's laws were no larger than they were when the Constitution was adopted over 150 years before — notwithstanding that his inherent authority to administer the executive branch departmental bureaucracy necessarily had grown with the task. In particular, with the adoption of the Distribution of Powers amendment and the other statutory enactments that treated the three branches of government as separate and distinct, any remaining *Page 13 
questions about the independence of the other branches and their departmental bureaucracies should have been put to rest.
Like all governors in modern times, Governor Carcieri wears more than one hat. First and foremost, he functions as the state's chief executive — the administrator charged with the detail of carrying the state's laws into effect. His second function is to administer the departmental bureaucracy that necessarily attends to the performance of his first function. The former is tightly circumscribed by the express language of the Rhode Island Constitution.[6] Attendant to the latter is the inherent authority to manage the executive's departmental bureaucracy and to execute any permissibly delegated legislative functions, as guided and circumscribed by that branch of government. And, as pointed out by Ms. Justice Savage of this Court in Castelli v. Governor, C.A. No. PC-0706322, 2008 R.I. Super. LEXIS 88, at *35 (July 31, 2008), within this context a governor has the inherent authority to take action within his own department to cut costs and raise revenues.[7] However, that authority — ever expanding as it may be due to the nature of the bureaucratic beast or the latest assignment of legislative tasks — derives from his or her function as the head of a department and is merely ancillary to his or her limited constitutional powers. The distinction is subtle but important. It is because of this distinction that the Legislature quite lawfully can impose merit system protections, collective bargaining obligations, and other operational parameters on all governmental *Page 14 
departments, including its own. When doing so, the Legislature does not impair the core constitutional powers of the other branches but, rather, merely establishes a framework for and constraints upon those branches' lawful exercise of the departmental administrative authority or delegated powers. See generally Gorham, supra; see, e.g., Lemoine v.Martineau, 115 R.I. 233, 238, 342 A.2d 616, 620 (1975) (concluding law exempting lawyer-legislators from appearance at trial during legislative sessions was unconstitutional usurpation of judicial power). Therefore, as Justice Savage also pointed out in Castelli, the governor may exercise his own prerogative in dealing with fiscal matters, but may do so only insofar as his actions are sanctioned by law. See Castelli, 2008 R.I. Super. LEXIS 88, at *35.
 IV Labor Law and Constitutional Contract Claims
In his papers filed with this Court, Governor Carcieri argues that "the inherent constitutional authority of the Governor to function as chief executive for the executive branch, especially after the Separation of Powers amendments in 2004, supercedes any statutes or labor-law principles that interfere with that authority, especially in time of crisis." (Def.'s Mem. in Opposition at 17, dated Aug. 6, 2008). Distilled, it is the Governor's contention that he has the authority to act free of any interference from the legislative and judicial departments, thereby de facto suspending or disregarding the laws of the state when he deems it expedient. Further reduced to its essence, it is the Governor's contention that he is above the law. The Governor is plainly wrong. In fact, this is precisely the kind of abuse of executive power that our system of government was designed to prevent. *Page 15 
Unquestionably, the Governor is charged with carrying out the law, and may not act in derogation of it. As the United States Supreme Court held in the celebrated case of
Marbury v. Madison: "when the legislature proceeds to impose upon the executive officer other duties; when he is directed peremptorily to perform certain acts; when the rights of individuals are dependant upon the performance of those acts; he is so far the officer of the law; is amenable to the laws for his conduct; and cannot at his discretion sport away the vested rights of others." 5 U.S. (1 Cranch) 137, 166, 2 L. Ed. 60, 70 (1803) (Marshall, C. J.).
For these very reasons the Governor's actions must be in compliance with the law even with respect to the employees over whom he has departmental administrative authority. See Castelli, supra.
With respect to the Union's state labor law and constitutional impairment of contract claims, the Governor undeniably is subject to the laws of this State, including the legislatively-imposed obligation to recognize and collectively bargain with the state employees' bargaining agents; to submit unresolved issues to mediation; and to proceed to binding arbitration in the absence of conciliation. See §§ 36-11-1,36-11-7, 36-11-8, and 36-11-9. So, too, the Governor undeniably is subject to R.I. Const., art. 1, sec. 12, the Contract Clause.See R.I. Const., art. 6, sec. 1 ("The Constitution shall be the supreme law of the state. . . ."). Finally, the Governor undeniably is subject to U.S. Const., art. I, § 10, the Contract Clause of the United States Constitution, that prohibits the states from passing any law impairing the obligations of contract — regardless of whether the law takes the form of legislation, departmental or agency rule, or administrative order.
However, the Labor Relations Board has exclusive original jurisdiction over the Union's labor-law claims. Warwick Sch. Comm. v. WarwickTeachers' Union, Local 915, *Page 16 613 A.2d 1273, 1276 (R.I. 1992). Furthermore, the Labor Relations Board has the authority and obligation to expeditiously determine questions such as whether the Governor lawfully terminated Council 94's collective bargaining agreement; refused to bargain in good faith; committed, or attempted to commit, an unfair labor practice by promulgating or implementing Executive Order No. 08-06; or otherwise committed unfair labor practices. Sections 28-7-21 and 28-7-25. Furthermore, the Board has the authority to make the factual findings necessary to determine whether the Governor violated the state's labor laws and the contract clauses of the Rhode Island and United States Constitutions. Section 28-7-22(b)(1). Finally, the Labor Relations Board is empowered, pursuant to § 28-7-9(b)(4), to order complete relief upon the finding of any unfair labor practice, and may seek judicial enforcement of its orders pursuant to § 28-7-26, if needed.
Therefore, it is this Court's conclusion that Council 94 has an adequate administrative remedy for those of its members who are employed by the executive branch and this Court should not grant injunctive relief in the first instance. Furthermore, as previously noted herein, this Court lacks original jurisdiction to determine Council 94's claims for labor-law violations and, to the extent Council 94 asks this Court to decide those claims, the claims must be dismissed. It is well settled that lack of subject matter jurisdiction can be raised by the trial court, sua sponte, at any time. See Krivitsky v. Town of Westerly,823 A.2d 1144, 1147 (R.I. 2003). *Page 17 
 V Separation of Powers
Questions presented by the instant case, insofar as they pertain to the effect of Executive Order No. 08-06 on the other branches of government, require a different result. Unlike questions having to do with the Governor's authority over the executive department of government, the extent to which the Governor may exercise power over the other branches and their respective departments and employees is not an issue — that question is one of degree and assumes a first step onto a very slippery slope.[8] The hard question is whether the Governor hasany power over the other branches and their respective departments and employees, other than to execute statutory requirements and regulations. The answer to that question is "no." As discussed previously herein, fundamental separation of powers principles as well as R.I. Const., art. 5 (Distribution of Powers) and state statutory law all position the other branches as independent of the executive branch and the executive branch lacks authority over them. Therefore, insofar as it purports to affect state employees other than those employed by the executive department, Executive Order No. 08-06 is unconstitutional, as a matter of law. Furthermore, because this is a question of law based upon uncontested facts, final *Page 18 
judgment should enter, forthwith, on the merits of Council 94's separation of powers based constitutional claims. See Super. R. Civ. P. 65, 57 and 58.
Finally, Council 94's request for injunctive relief should be granted. The principal prerequisite to obtaining permanent injunctive relief is the prevailing party's ability to prove that it is being threatened with some immediate irreparable injury for which no adequate remedy at law lies. See Paramount Office Supply Co. v. MacIsaac, 524 A.2d 1099, 1102
(R.I. 1987); see also Brown v. Amaral, 460 A.2d 7, 10 (R.I. 1983). Such irreparable injury must be either presently threatened or imminent, and harm that is prospective in nature, or that might not occur, cannot form the basis for injunctive relief. R.I. Turnpike Bridge Auth. v.Cohen, 433 A.2d 179, 182 (R.I. 1981). The law is sufficiently well settled that constitutional violations, due to their very nature, constitute irreparable harm warranting injunctive relief. 11 C. Wright A. Miller, Federal Practice and Procedure, § 2948.1, at 161 (1995); 43A C.J.S. Injunctions § 65 (2004).
 VI Conclusion
By allowing a deficit-burdened budget to become law while relying upon future revenues that he and the Legislature had dubious power to secure, the Governor embarked upon a perilous mission, fraught with constitutional and other legal difficulties that, unfortunately, may well cost the State more in time and litigation than it stood to gain. Equally as unfortunately, this Court finds it necessary to order that Governor Donald L. Carcieri, as governor of the State of Rhode Island and the head of its executive department, is permanently restrained and enjoined from implementing Executive Order *Page 19 
No. 08-06 against any state employees employed by governmental departments other than the executive department.
Judgment shall enter in favor of Council 94 on Counts I and II of the Complaint. Count III is denied and dismissed. Council 94's demand for attorney's fees and cost shall be considered post-judgment.
[1] The judicial department and, presumably, the legislative department have continued to implement their own cost saving measures. For example, Assistant State Court Administrator Stephen King most recently announced in a communication dated August 7, 2008 that the judiciary has implemented an increase in all non-union employees' health-care premium contributions.
[2] In addition to Council 94, the Governor's executive order states that it is directed to the following unions: "Council of Budget Personnel; Association of Clerical-Technicals/URI/National Educational Association of Rhode Island; Professional Staff Association of the Rhode Island Department of Health/National Education Association of Rhode Island; Rhode Island Brotherhood of Correctional Officers — Professional Unit; Rhode Island Court Reporters Alliance, Local 4829, RIFTH/AFT, AFL-CIO; Rhode Island Probation Parole Association of Classified Employees (Clericals/Aides); Rhode Island Probation Parole Association of Classified Employees (Supervisors/Counselors)." (Pl.'s Ex. B, Def.'s Ex. G, Executive Order dated July 31, 2008.)
[3] It is well settled that the Rhode Island Constitution does not permit the Legislature to grant unrestricted delegations of legislative power, but a delegation is constitutional as long as the Legislature demonstrates standards or principles to confine and guide the agency's power. See, e.g., Almond v. R. I. Lottery Comm'n, 756 A.2d 186, 191-92
(R.I. 2000).
[4] Not long after the shutdown was implemented, Governor Sundlun agreed to reimburse all state employees for their lost pay.
[5] When construing statutes, "`if the language is clear on its face, then the plain meaning of the statute must be given effect' and this Court should not look elsewhere to discern the legislative intent."Fleet Nat'l Bank v. Clark, 714 A.2d 1172, 1177 (R.I. 1998) (quotingGilbane Co. v. Poulas, 576 A.2d 1195, 1196 (R.I. 1990)). "[T]he Constitution was written to be understood by the voters; its words and phrases were used in their normal and ordinary sense as distinguished from technical meaning." McKenna v. Williams, 874 A.2d 217, 242 (R.I. 2005) (Suttell, J., concurring and dissenting) (citing In re AdvisoryOpinion (Chief Justice), 507 A.2d 1316, 1323 (R.I. 1986)).
[6] See Narragansett Indian Tribe v. State, 667 A.2d 280, 281-82 (R.I. 1995). In Narragansett Indian Tribe, the Rhode Island Supreme Court refused to read the so-called implied powers doctrine into the executive-authority language of the Rhode Island Constitution, specifically holding, "[t]hat doctrine is not applicable to this court's analysis of the Governor's powers under the Rhode Island Constitution."
[7] Close examination of the Court's decision in Castelli reveals that Ms. Justice Savage carefully limited her findings and declarations to the Governor's powers insofar as they relate to his administration of the executive department. Importantly, questions pertaining to separation of powers were not before the Court in Castelli and Ms. Justice Savage noted as much. See Castelli, 2008 R.I. Super. LEXIS 88, at *21 ([The plaintiffs] likewise do not contend that their lay offs would impact the judiciary in a way that might create separation of powers issues.").
[8] In In re State Employees' Unions, the Rhode Island Supreme Court spoke in terms of "grievous" interference with the judiciary when it pointed out that the Chief Justice or his designee, the court administrator, could seek injunctive relief to protect the functioning of the judiciary. In re State Employees' Unions, 587 A.2d 919, 923 (R.I. 1991). However, given the procedural posture of that case and the fact that the separation of powers questions had not been fully framed, this Court does not take that dicta to imply that a governor can assert executive powers over the judiciary so long as it doesn't reach egregious proportions. To do so would ignore fundamental separation of powers principles and send the branches of government into endless squabbling over what actions may or may not have a grievous effect on the other. Moreover, as previously noted herein, that language stands for the proposition that the chief executive must exercise care for the functioning of the other branches of government even as he undertakes costs savings within his own governmental department.